NEW-YORK,
August, 1814.

LAWRENCE
v.
OCEAN INS. Co.

LAWRENCE, Survivor of WHITNEY, *against* THE OCEAN IN-
SURANCE COMPANY.

THIS was an action on a policy of insurance, dated the 24th
of *May*, 1810, on goods laden or to be laden on board of the
*American* ship *Atlantic, Jayne* master, " at and from *New-York*
to *Gottenburgh*, and at and from thence to one port in the *Bal-
tic*, or *Black Sea*, not south of the river *Eyder*." The risk to
continue until the goods should be safely landed " at *Gottenburgh*,
and one other port."

The premium was 9 1-2 *per cent.*, to return 3 1-2 *per cent.* if the
risk ended safely at *Gottenburgh*. Warranted free from seizure in
port, except in *Swedish* or *Russian* ports. The plaintiff claimed
a total loss by *French* capture.

On the 6th of *November*, 1811, the plaintiffs gave information
to the defendants of the capture of the ship by a *French* priva-
teer, and abandoned to them the cargo, to the amount insured
thereon, as for a total loss, and at the same time delivered to
them the proof of interest and loss. The defendants objected
to the sufficiency of the preliminary proof, because the proof

Goods were in-
sured " from
*New-York* to
*Gottenburgh*,
and at and
from thence to
one port in the
*Baltic* or *North
Sea*, not south
of the river
*Eyder*." " The
risk to continue
until the goods
should be safely
landed at *Got-
tenburgh* and
one oth. rport."
The ship sailed
from *New-York*
the 29th of
*May*, 1810, and
arrived at *Got-
tenburgh* in the
month of *July*
following,
where she re-
mained until
the 8th of *Octo-
ber*, being de-
tained by ad-
verse winds.
The master,

according to instructions from the supercargo, sailed from *Gottenburgh* to *St. Petersburgh*, to which place
he intended to proceed, but meeting with accidents, was compelled, from necessity, to put into *Carlsham*,
as the nearest port, for repairs, where he arrived about the 10th of *November*, and was detained by ad-
verse winds until the season was too far advanced to attempt the navigation of the *Gulf* of *Finland;*
and he accordingly wintered at *Carlsham*, intending to pursue the voyage to *St. Petersburgh*, as soon as
the navigation was open. About the 7th of *April*, 1811, the supercargo determined to send the ship to
*Stockholm* instead of *St. Petersburgh;* and as soon as the navigation was free, which was about the same
time for both those places, the ship, about the 2d of *May*, in the afternoon, sailed from *Carlsham* for *Stock-
holm*, and early the next morning, off the west end of the island of *Ouland*, while in the direct route, either
to *Stockholm* or *St. Petersburgh*, and before she had come to the dividing point, she was captured by a
*French* privateer and carried into *Dantzic*, and was afterwards condemned by the council of prizes at
*Paris*. It was held that there was an intended deviation only, and the loss having happened before the
vessel arrived at the dividing point, the insurers were liable for a total loss.

The assured exhibited to the insurers the usual documents and proof of *interest*, and also a copy of a
letter from merchants at *Hamburgh*, to the owners of the ship, mentioning her capture and condem-
nation, which was the only proof of loss in the possession of the assured ; this was held to be sufficient
preliminary proof of interest and loss within the clause in the policy.

Where, by an order of the court, the assured were directed to produce, under oath, to the assurers, all
letters and papers in their possession, or under their control, relative to the matters in issue ; it was held
that the insurers were entitled to read the whole correspondence and papers produced pursuant to such
order, it being analogous to an *answer* to a bill of discovery, in chancery, the whole of which the party
is entitled to read.

If a vessel is insured from *N* to *G*. and one other port, she may stay at *G*. a reasonable time
after her arrival, to make the necessary inquiries as to a market, &c., without its being considered a
deviation, and what is a reasonable delay, in such case, is a proper question for the jury to decide.

Where an *American* vessel sailed from *Gottenburgh*, bound to *St. Petersburgh*, the next day after a *Bri-
tish convoy*, and came up with the convoy the day after, and kept company with it through the *Belt*, but,
without receiving or exchanging any signals, or receiving any assistance from the convoy, and without
altering its course or retarding its voyage on account of the convoy, this was not considered as sailing
under a *British* convoy, so as to affect the right of the insured to recover for a total loss, in conse-
quence of a capture by the *French*, though the ground of the condemnation was stated to be, her ha-
ving sailed under *British* convoy.

NEWYORK, of loss was only a copy of a letter from Messrs. *Parish & Co.*
August, 1814. merchants at *Hamburgh*, dated the 20th of *September*, 1811, to
LAWRENCE Messrs. *Hoyt & Tom*, the owners of the ship, inclosing a let-
v. ter, dated at *Paris* 11th *September*, 1811, from Captain *Jayne* to
OCEAN INS. CO. Messrs. *Parish & Co.* informing them of the condemnation of the
*Atlantic*, by the court of prizes ; and stating the reason given for
the condemnation to be, that the ship had been under *English*
convoy, which the court considered as a denationalization.
The objection to this proof was overruled by the judge.

The master, *Jayne*, testified that he sailed from *New-York* in
the ship *Atlantic*, on the voyage insured, the 29th of *May*, 1810,
and on or about the 17th of *July*, following, arrived at the
quarantine ground in *Wingo Sound*, which is between 10 and 20
miles below the harbour of *Gottenburgh*. After a quarantine of
4 days, the *Atlantic* went into safe harbour, about the 25th of
*July*. Soon after the expiration of the quarantine, he received
sailing instructions from the supercargo, to proceed with the *At-
lantic* from *Gottenburgh* to *St. Petersburgh* in *Russia*. The
ship remained at *Gottenburgh* until the 8th of *October* following,
being detained from about the 26th or 28th of *July*, until that
time, by adverse winds. Several hundred vessels which put
into *Gottenburgh*, during that time, were also detained by adverse
winds. The master was instructed by the supercargo not to
take convoy. A convoy with a great number of vessels, which
had been detained at *Gottenburgh* by adverse winds, got under
weigh and sailed from that place on the 7th of *October*. The
*Atlantic* sailed on the 8th day of that month, bound to *St.
Petersburgh* in *Russia*, and on the next day came up with
the convoy. Two or three *American* vessels sailed from
*Gottenburgh* before the *Atlantic*, but the master testified that
it was by beating against a head wind; and that the *Atlan-
tic*, with the cargo she had on board, did not beat well; and
that from the 26th or 27th of *July*, until she left *Gottenburgh*, the
wind was never, in his opinion, such as could permit him to sail
with safety or prudence.

After the *Atlantic* left *Gottenburgh*, on the 9th of *October*,
she encountered continued adverse winds, for 20 days, and
had frequently to come to anchor, in making her passage
through the *Great Belt*, and while at anchor was run foul of
by a *Galliott*, by which the jib-boom and main yard were

carried away, and the windlass had become strained and weakened. The *Atlantic* entered the *Baltic* about the 1st *November*, but in consequence of the damage she had received, it was necessary to make the first port to repair; and after consultation, it was determined to put into *Carlsham* for that purpose, that being the nearest port, where they arrived between the 1st and 10th of *November*. Having repaired the damage, the *Atlantic* sailed from *Carlsham* for *St. Petersburgh* about the 10th of *November*, but meeting with violent adverse winds the ship returned to *Carlsham* the next day; and the wind continued so adverse as to prevent any attempt, for 10 or 15 days, to pursue their voyage to *St. Petersburgh*. The master then thought the season too far advanced to attempt to navigate the Gulf of *Finland*, and dismantled the ship, intending to winter at *Carlsham*, and to pursue the voyage to *St. Petersburgh*, when the navigation should be open the ensuing spring.

A month or two after the *Atlantic* was laid up at *Carlsham*, war was declared between *England* and *Sweden*, and the *Atlantic*, as well as other foreign vessels at *Carlsham*, were seized by order of the *Swedish* government, and her papers sent to *Stockholm*, and the master went to *Stockholm* and obtained her liberation.

About the 2d of *May*, 1811, the navigation of *Carlsham* opened, and the *Atlantic*, about that time, sailed from thence, being then destined for *Stockholm*, the voyage to *St. Petersburgh* having been given up. A number of other vessels bound up the *Baltic* had also wintered at *Carlsham*; but the *Atlantic* was among the first that was ready for sea, and sailed from *Carlsham* in the afternoon of the 2d of *May*; and early the next morning, off the southwest end of the island of *Ouland*, distant three leagues, was boarded by a *French* privateer, and carried into *Dantzic*. The ship's papers were sent to *Paris*, where the master went, and the ship and cargo were condemned by the court of prizes at *Paris*, about the 10th of *September*, 1811. The copy of the sentence of condemnation, which was produced and verified by the witness, contained the following sentence: " the council decides the prize made by the *French* privateer *Le Petit Diable*, of the ship *Atlantic* under the *American* flag, carried into *Dantzic*, good and valid; consequently adjudges to the owners and crew of the said privateer all the said vessel, &c. as well as the merchandize of her cargo; the whole to be sold

at vendue, according to the forms, and in the manner prescribed by the laws and regulations made concerning prizes."

The master further testified, that when the *Atlantic* was taken she was on the direct route either to *Stockholm* or *St. Petersburgh;* that had she been going to either of those places, her course, after she left *Gottenburgh,* and till she was taken, would not have been different.

On his cross examination, the master said, that he was under the directions of the supercargo for the voyage; that 4 or 5 days after the arrival of the ship in *Wingo Sound,* the supercargo went to *Gottenburgh;* and on his return to the ship, he said he should wait at *Gottenburgh* for letters from *Hamburgh* and *Copenhagen,* and that in his letters from *Copenhagen,* he expected to receive a *Danish Sound pass,* which was an essential document in order to pass through the *Belt.*

The master said he sailed from *Carlsham* as soon as possible after the navigation was open, which happens about the same time to *Stockholm* and *St. Petersburgh.* When he went to *Carlsham* he had no intention of going to *Stockholm,* but intended to pursue the voyage to *St. Petersburgh,* as soon as the necessary repairs were made. Whether it was his intention to go to *Stockholm* or *St. Petersburgh,* he must, in either case, have stopped at *Carlsham.* If he had intended to have gone to *Stockholm,* he could not, after the detention at *Carlsham,* have reached *Stockholm* that autumn, on account of the lateness of the season. He said it was his intention, when he left *Gottenburgh,* to keep company with the convoy; but not, if by doing so, he should be obliged to go out of his way, or, in any respect, alter the course of or retard his voyage; that he came to anchor only on account of adverse winds, and only where he should have done so had his ship been alone ; that he made frequent attempts to get ahead of the convoy, but always fell astern, and was often so far behind as to be entirely out of their protection. The convoy paid no attention to the *Atlantic,* and made no signal to her, nor did the *Atlantic* make any signal to the convoy. When the *Atlantic* was injured by being run foul of, a boat from another vessel came to offer assistance, which was declined, lest it might be considered as connecting the *Atlantic* with the convoy. The convoy was understood to be *British.*

The defendant's counsel, after giving some evidence, which it is not necessary to state here, as to the seaworthiness of the

ship, in not having sufficient cables when she left *Gottenburgh*, &c., offered to read sundry letters from the supercargo to the owners of the *Atlantic*, relative to the stay of the *Atlantic* at *Gottenburgh*, which letters, with various others, concerning different events of the voyage, to and from various persons, had been furnished to the plaintiffs, pursuant to a rule of the court, in the cause.(*a*)

The plaintiff's counsel objected to the reading of the letters offered, unless all the letters and documents which had been

NEWYORK, August, 1814.

LAWRENCE
v.
OCEAN INS. Co.

(*a*) LAWRENCE, SURVIVOR OF WHITNEY, *against* THE OCEAN INSURANCE COMPANY.   Jan.term,1813.

S. JONES, jun. for the defendants, moved for a rule that the plaintiff in this cause produce, on affidavit, to the defendants. or their attorney, within such reasonable time as the court should direct, all the written correspondence or letters, in the possession of the plaintiff, or under his control, or in the possession of, or under the control of, *Goold Hoyt*, trading under the firm of *Hoyt & Tom.* at any time heretofore carried on or interchanged between the master or supercargo of the ship *Atlantic*, mentioned in the plaintiff's declaration, and any, and all persons, in the *United States*, or in foreign parts, relating to the said ship, her cargo, or the voyage mentioned in the declaration of the plaintiff, and also, all letters of instructions to the captain or supercargo, and each of them, from any person or persons whatever, relating to the said ship, cargo, or voyage, or otherwise concerning this cause; and that the plaintiff allow the defendants, or their attorney, to inspect the same, and take copies thereof, or that the plaintiff deliver to the defendants, or their attorney, true copies thereof at large; and that in the mean time, and until 60 days after the production of such correspondence, letters, and papers, &c. all proceedings on the part of the plaintiff be stayed, or for such other or further relief as the court may think fit and reasonable.

In causes on policies of insurance, the court will make an order for the assured to produce to the insurers, upon affidavit, all papers, or true copies thereof, relative to the matters in issue between the parties.

*Wells*, also, argued in support of the motion. They cited *Goldschmidt v. Marryat*, (1 Campb. N. P. Cases, 559, 562.) and *Clifford v. Taylor*, (1 *Taunt. Rep.* 167.)

*Colden*, contra.

It appeared, from the affidavits read, that the defendants had made a demand of the plaintiff of the letters and papers, or copies thereof, which were the object of this motion, and that he referred them to *Goold Hoyt*, who was concerned in the cargo, and had a similar claim against the defendants, and said that he would consent to whatever *Hoyt* would do in the business; that application was then made to *Hoyt*, who refused to produce or deliver the original correspondence, &c. to the defendants or their counsel, but said that the president of the company, and two or three of the directors, might, in his room and in his presence, read and examine the papers, but without their counsel being present.

The affidavit of the president of the company was also read, stating that such letters, papers, and documents, were in the possession of the plaintiff, or under his control, and that the defendants, as they were advised by counsel, could not safely proceed to trial without them, or true copies thereof.

*The Court* granted the following *Order:*      "*Supreme Court, January* 21, 1813.

"It appearing to the court, in this cause, that the action is on a policy of insurance, and that the defence made thereto is, that the assured used belligerent convoy; that there has been a deviation from the voyage insured, or a substitution of another voyage instead thereof, and upon due notice and motion for that purpose by the defendants' counsel, and upon hearing counsel on both sides, ORDERED, that the plaintiff produce upon affidavit, to the defendants, or to their attorney, the written correspondence or letters, or copies thereof, in the possession of the plaintiff, or under his control, heretofore carried on or interchanged between the master or supercargo of the ship *Atlantic*, men-

NEWYORK,
August, 1814.

LAWRENCE
v.
OCEAN INS. Co.

furnished pursuant to the rule of the court, were also to be considered in evidence, so far as the plaintiff was entitled to read any of them. The defendants' counsel insisted that reading from the correspondence, as to a particular point, would not authorize the plaintiff's counsel to read what related to other matters wholly distinct. The judge overruled the objection of the defendants' counsel, and decided that any of the letters might be read by either party.

In a letter from the supercargo to the owners of the ship and the plaintiff, dated *July* 21st, 1810, at *Gottenburgh*, he states that *Gottenburgh* afforded no market, and that he had written to inquire the state of the ports in *Holstein, Prussia,* and *Swedish Pomerania;* that the risk of proceeding to another port was great, " as the *Danes* captured every thing; the only alternative seemed to be, to take *British* convoy, and instead of going through the sound, to pass through the *Belt*," &c. " That he should rather remain where he was than risk the property in any way that might affect the insurance." In another letter from the supercargo to the plaintiff, dated *Gottenburgh,* the 10th of *August,* 1810, speaking of the necessity of proceeding to another port for a market, and that other vessels had been ordered to a port in *Holstein,* he adds, " which would hardly have been done if there was danger of capture in port; and if captured previous to arrival, the owners were protected by the insurance." The plaintiff's counsel then read several passages from the correspondence. In a letter from the supercargo to the owners, dated *September* 26, 1810, in which he speaks of the long detention at *Gottenburgh* by continued adverse winds, he states that the best of the season was past, and that there was great hazard of being obliged to winter in the *Baltic;* and that if the wind continued many more days unfavourable, he should be obliged to abandon the *Baltic* expedition, or go up with the certainty of wintering there; that several *American* ships had received instructions from the *British* commander, and formed part of his convoy to the

tioned in the declaration, and each of them, and any other person or persons, or such parts thereof as relate to, or concern, the said ship or her cargo, in respect to the voyage, in the said declaration mentioned : and also all the letters of instructions to the said captain or supercargo relative to the said ship and cargo, in respect to the voyage aforesaid : and that in the mean time, and for 10 days after the production of the said papers, the proceedings in this cause on the part of the plaintiff be stayed; provided, however, that the said papers shall be only used in support of the said defence, and not of any other."

*Baltic;* that in case of capture by the *Danes* they would be condemned for sailing with such convoy, and it might be the cause of difficulty with the underwriters; and that he had instructed Captain *Jayne* not to receive instructions of such convoy, but that there would be no impropriety in sailing with the first fair wind, even if he passed through the *Belt* at the same time with the convoy.

In a letter from the supercargo to the owners, dated at *Carlsham,* the 31st of *October,* 1810, he mentions that his destination, on leaving *Gottenburgh,* was to *St. Petersburgh,* but having been obliged, in consequence of injuries sustained, to make the first port to repair, he had put in there, and expected to sail in two days for *St. Petersburgh,* but should the weather set in severe, he should go into *Revel.* In another letter from the supercargo, dated the 14th of *November,* 1810, he mentions the detention of the ship at *Carlsham* by adverse winds, but that notwithstanding the lateness of the season, he had made an attempt to proceed to *St. Petersburgh* or *Revel,* but was driven back to *Carlsham* by adverse winds, and that it was necessary to winter there, &c. That " as soon as the navigation opened in the spring, the ship would leave *Carlsham* for *St. Petersburgh;* that in the mean time he should order 80 tons of iron, and 230 tons of hemp to be ready for her at *Cronstadt,* that on her arrival, as soon as her cargo was landed, she might be immediately despatched." In another letter, dated at *Carlsham,* the 17th of *November,* 1810, he recommends insurance on ship and cargo, from *St. Petersburgh* home. In a letter from the supercargo to Captain *Jayne,* dated *Carlsham,* 17th of *February,* 1811, he says, " As the destination of the *Atlantic,* as soon as she can leave this port, is fixed for *Russia,* I now, as supercargo, and in virtue of the authority vested in me, by the owners, give you the following instructions, relative to your destination and proceedings, on your arrival at *St. Petersburgh,*" &c. In a letter, dated *St. Petersburgh,* the 10th of *March,* 1811, from merchants there to the supercargo, they state that the documents, relative to the cargo of the *Atlantic,* communicated to them, were very full, and would formerly have entitled it to admission in the *Russian* ports, (as they did not have the least doubt of its neutrality,) but that the orders of the government being positive that any cargo from *America,* &c. must have a certificate of origin of a *Russian* consul, the admission of the *Atlantic's* cargo, being defi-

cient in that document, would wholly depend on the *grace* of the government.

In another letter, dated the 17th of *March*, 1811, from the same merchants at *St Petersburgh*, to the supercargo, they say, " You will consider, from the regulation being positive, that every cargo or parcel of goods, imported hereafter into this country, must be accompanied with the *Russian* consul's certificate, whether it may be worth your while to venture on the voyage to *Cronstadt*."

On the 7th of *April*, 1811, the supercargo wrote from *Carlsham* to his owners, enclosing the letters from his correspondents at *St. Petersburgh*, saying, " They confirm me in the opinion, that it is most for your interest to land the *Atlantic's* cargo at *Stockholm*, and I now inform you, that in the course of 10 days she will proceed to that port."

In a letter from Captain *Jayne* to the owners, dated *Dantzic*, the 6th of *May*, 1811, he informs them of the capture of the *Atlantic* by a *French* privateer, in 12 hours after her departure from *Carlsham*, and of her being sent into *Dantzic*, &c.

The *Russian* consul at *New-York* testified, that at the time of his appointment, which was the 16th of *March*, 1810, he was directed by the *Russian* consul general to give public notice that the cargoes of *American* vessels, bound to *Russia*, must be furnished with the *Russian* consul's certificate of origin; and that he was accordingly applied to for such certificates, and from the 31st of *March* to the 29th of *May*, 1810, issued 31 such certificates to *American* vessels, bound to *Russia*.

On the 19th of *July*, 1811, the plaintiff addressed a letter to the defendants, informing them of the arrival of the *Atlantic* at *Carlsham*, and her situation, and that the supercargo had written on the 28th of *April* that he was only waiting for a fair wind to leave that place for *Stockholm*, and that as a question might arise, in case of accident, whether the ship had not deviated, and that as they were not willing to have so large an amount of property at risk, by which any doubt might arise, as to a recovery in case of loss, they request the defendants to say on what terms they would give liberty to proceed to *Stockholm*.

The judge left the point of seaworthiness to the jury, as a question of fact, intimating, however, his opinion, that the weight of evidence was against the sufficiency of the cable when the vessel left *New-York*. That as it appeared that the

vessel had sailed from *Gottenburgh* with an intention to proceed to *St. Petersburgh*, and had, after she had been obliged to put into *Carlsham* in distress, and before she sailed from that port, at the opening of the navigation, in the spring of 1811, determined to change her destination, and proceed to *Stockholm*, instead of *St. Petersburgh*, and having sailed from *Carlsham* with the intention to go to *Stockholm*, and that intention not having been changed when she was captured, it became a question whether the policy was not discharged; but this question was, by the consent of the parties, reserved for the opinion of the court.

That, after disposing of the question as to the seaworthiness the next question for the consideration of the jury was, whether there had been an actual delay at *Gottenburgh*. That under the policy, he was of opinion that the vessel was not confined to a mere right to touch at *Gottenburgh*, but had a right to remain there a reasonable time, to make inquiries respecting the markets, or for any other purpose; that a delay for eight or ten days did not appear to him unreasonable, even if the winds had been fair for her departure during that time. But if, after that time, the *Atlantic* had voluntarily remained at *Gottenburgh*, waiting for a convoy, or from any other cause than necessity, it would be deviation, and discharge the insurers. That the weight of testimony, in his opinion, was strongly in favour of the fact that there had been no such voluntary detention.

That another question for the consideration of the jury was, whether the *Atlantic* had sailed from *Gottenburgh* under convoy. If she waited for convoy, or retarded her voyage for the sake of the protection of convoy, it would discharge the defendants; but a mere sailing in company with convoy, would not, in his opinion, vitiate the insurance, and it appeared from the evidence that the *Atlantic* had done no more. That if the jury believed the vessel to be seaworthy, and agreed with him on the points submitted to them, they would find a verdict for the plaintiffs, subject to the opinion of the court on the point reserved; the amount to be recovered to be settled by persons to be appointed by the court, at the time judgment should be given.

The jury found a verdict for the plaintiffs, subject to the opinion of the court, on the question reserved.

The following points were raised by the plaintiffs' counsel for the consideration of the court:

1. The preliminary proofs were sufficient;

2. The plaintiffs had a right to read any part of the correspondence, under the rule of court;

3. The question raised as to the seaworthiness of the vessel was submitted to the jury, and their verdict is not against evidence;

4. The delay at *Gottenburgh* was reasonable and justifiable, and the charge of the judge on that point was correct;

5. The vessel did not sail under convoy; and her sailing in company with convoy, was no breach of the warranty in the policy;

6. The vessel was not obliged to elect her second port before she left *Gottenburgh*, but might proceed from thence to any other port, provided she was never, after she left *Gottenburgh*, on the route to more than one port;

7. While at *Gottenburgh*, she did elect *St. Petersburgh*, though she afterwards intended to go to *Stockholm*; yet having been captured while she was on the route to *St. Petersburgh*, there was merely an *intended*, and not an actual, deviation.

*Colden*, for the plaintiffs, said he should argue only the two last points, being those reserved; leaving the other points for the decision of the court, on the authorities which might be cited.

1. The vessel was not bound to elect her second port, before she left *Gottenburgh*, but might proceed from thence to any other port, so that she was never on the route to more than one port, and never put the insurers to more than one risk.

The object of this species of insurance is to give to the assured the advantage of all information which may be obtained abroad, when the vessel is going to look for a market; and she may avail herself of the information obtained after she leaves her first port, as well as of that previously received, provided, however, and the argument is to be understood with that qualification throughout, that the insurers are never subjected to more than one risk. If she advances one foot on a second or different route from the one she set out upon, no doubt the policy would be at an end.

Suppose an insurance from *New-York* to a port in *Europe*, and the vessel sails for *London*, and while she is in the route to *London*, but before she is at the dividing point, she hears of

war with *England*, may she not change her destination and go to *Cadiz?*

Insurances to a port and to a market, are very frequent; but it has never been understood that the vessel is bound to elect her market before she left the first port, nor that she is obliged, at all events, to adhere to that election.

Another form of insurance, also very common, is to a particular port, and from thence to a port of discharge; but it has never been supposed that the port of discharge must be elected at the first port.

Indeed, to give the construction to the policy which will be contended for by the defendants' counsel, would be to add words to the policy, and substitute another contract between the parties. It would make the language of the policy, instead of the words used, to be, that the insured shall make his election at the first port, and when made, that the vessel should go to the elected port, and no other.

There is no reason why the insured should be bound to make an election at the first port, if by not doing so, he puts the assurer to no additional risk. The assured is under the same necessity of showing that the vessel was never in two routes, as he would be of showing there was no deviation, if the second port had been specified in the policy. Admitting, even, that this kind of insurance may subject the insurers to additional hazard, or the chance of imposition, yet these chances must, or ought to have been, taken into consideration at the time the insurance was made, and if so, it is to be presumed that a premium was taken proportioned to the risk.

2. If the vessel was obliged to elect her second port at *Got-tenburgh*, she did in fact elect *St. Petersburgh*, and though she afterwards intended to go to *Stockholm*, yet having been captured while she was in the route to *St. Petersburgh*, and before she came to the dividing point, it was only an intended, not an actual, deviation.

The difference between an abandonment of a voyage and an intended deviation, is well settled. An abandonment of the voyage, is where the destination is changed before the voyage commences. An intended deviation, is where there is an intention, formed after the commencement of the voyage, to go to a port different from the one permitted by the policy.*

* *Marsh. on Ins.* 184.

Admit, then, that *St. Petersburgh* was elected, it may be con-

sidered as if actually inserted in the policy, and the voyage would be from *New-York* to *Gottenburgh*, and thence to *St. Petersburgh*. Considering, then, *New-York* to *Gottenburgh* as the *terminus a quo*, there was no intention to deviate, until the voyage commenced; for the vessel left *Gottenburgh* on her ulterior voyage, with the sole intention of going to *St. Petersburgh*, the voyage insured. It is not, and cannot be, pretended, that there was any deviation in going to, or remaining at, *Carlsham*, since it is proved that she went and remained there from necessity; and it was not until a very short time before the vessel sailed from *Carlsham* that the intention to go to *St. Petersburgh* was changed; and it is proved that the *Atlantic* sailed from *Carlsham* at the same time, and pursued the same course, until her capture, that she would have done had she been bound either to *Stockholm* or *St. Petersburgh*. While at *Carlsham*, she was as much on her voyage to *St. Petersburgh*, as if she had been on the open sea. Suppose that after she left *Gottenburgh*, and while on the open sea, in her route to *St. Petersburgh*, the captain or supercargo had determined to go to *Stockholm* instead of *St. Petersburgh*, and had pursued that intention, this would not have amounted to a deviation, so as to avoid the policy, if the vessel had been lost before she came to the dividing point, and while she was in the direct route to her proper port.

The intention of going to *Stockholm* was formed by the supercargo, on receiving, while at *Carlsham*, information, no matter whether well founded or not, that on account of certain decrees of the *Russian* government, the vessel would not be admitted into a *Russian* port, without certain certificates, with which she was not furnished. Now, if after she sailed from *Carlsham*, with intent to go to *Stockholm*, but before she came to the dividing point, she had been met at sea, and this information had been contradicted; or suppose she had heard that *Stockholm* was shut, and *St. Petersburgh* open, and had gone direct to *St. Petersburgh*, would the intention of going to *Stockholm* have vacated the policy, so that the assured could not have recovered, if the vessel had been lost before she arrived at *St. Petersburgh*, though she never had been, for a moment, out of the route to that port?

A mere intention to deviate has no effect on the contract of insurance; there is always a *locus penitentiæ*, and, until the intention is in part executed, it is to be presumed that the party

will avail himself of it; and there was ample room for him to do so in the present case, for the vessel was captured immediately after leaving *Carlsham*, and at a great distance from the dividing point.

Again, it will be contended by the defendants that the information which induced the intention to go to *Stockholm*, was unfounded, and that the *Russian* decrees did not apply to the cargo of the *Atlantic*. If so, might she not have learned the truth before she arrived at the dividing point, and thereby have been induced to pursue, without deviation, the voyage to *St. Petersburgh?*

The terms, abandonment of voyage, or dereliction of voyage, are not applicable to this case. Wherever there is an abandonment of a voyage there must be a return of premium. Suppose the voyage to be described in the policy, from *New-York* to *Gottenburgh*, and from thence to *St. Petersburgh*. If the voyage to *St. Petersburgh* had been abandoned, the insured would be entitled to a return of premium, *pro tanto*. But as the vessel was on the route to *St. Petersburgh*, and it was not abandoned before capture, there could be no claim for a return of premium in this case.

The cases decided in our courts, on the subject of deviation, are those of *Silva* v. *Low*,[*] *Henshaw* v. *The Marine Insurance Company*,[†] *Forbes* v. *Church*,[‡] and *Tucker* v. *Marine Insurance Company of Alexandria*.[§] The case of *Henshaw* v. *The Marine Insurance Company*, is a very strong case to show that a mere intention to deviate can have no effect on the contract of insurance.

[* 1 Johns. Cases, 184.
† 2 Caines' Rep. 274
‡ 3 Johns. Cases, 159.
§ Cranch Rep. 357.]

The *English* cases, as to deviation, and which are to be found in *Marshall*[||] and *Parke*,[**] are *Foster* v. *Wilmer*, (2 *Stra.* 1249.) *Kewley* v. *Ryan*, (2 *H. Bl.* 343.) *Thelluson* v. *Ferguson*, (*Doug.* 61.) *Lavabre* v. *Wilson*, (*Doug.* 284.)

[|| Marsh. on Ins. 202, 203.
** Park Ins. 112. 436.]

As to the sufficiency of the preliminary proof, the counsel cited *Talcot* v. *Marine Insurance Company*,[††] *Craig* v. *United Insurance Company*,[‡‡] *Barker* v. *Phœnix Insurance Company*.[§§]

[†† 2 Johns. Rep. 130.
‡‡ 6 Johns Rep. 226.
§§ 8 Johns. Rep. 307.]

As to the second point, he cited, 1 *Peake's Law of Ev.* 35. *Bull. N. P.* 237. *Vin. Abr.* tit. *Ev. Ab.* sec. 16. p. 94. 2 *Bac. Abr.* 621. tit. *Ev. F.* 2 *B. & P.* 548.

To show that the sailing in company with *British* convoy could not affect the policy, and that even if the vessel had availed herself of it, to avoid imminent danger, it would not have avoided the

NEWYORK, policy, he cited *Wilson* v. *Marine Insurance Company*,[*] and
August, 1814. *Post & Minturn* v. *The Phœnix Insurance Company*.[†]

LAWRENCE
v.
OCEAN INS CO.     *Griffin* and *Wells*, contra. 1. The insured was bound to
[*] 3 Cranch,187.  make his election, as to the ulterior port, at *Gottenburgh*, other-
[†] 10 Johns.Rep.  wise, on her sailing from *Gottenburgh*, there would have been
no *terminus ad quem*—no voyage. It is the *termini* that con-
stitute the voyage; and it is *essential* that the voyage insured
[‡] Mar. Ins. Co.  should be *certain*.[‡]
v.  Wood,   6
Cranch, 29. 47.    But it is enough that the insured did, in fact, before the de-
parture of the vessel from *Gottenburgh*, elect *St. Petersburgh* as
the ulterior port; and that election once made, must be final
[§] 3 Com. Dig.  and irrevocable. This is the settled rule of common law.[§]
414. Elect. C.2.  The same rule prevails in chancery,[‖] and is adopted by the ma-
9 Vin. Abr.362.
Elect. E. 3 Co.  ritime law; as if an insurance be made on goods on board of
26. b.           "any ship," the insured having once elected a ship, and in which
[‖] Anstr. 229. 2
Str. 1248. Dick  he has put the goods and commenced the voyage, cannot after-
v. Barrell.      wards put them on board of another ship, except in a case of
necessity.

So the insured in this case, having elected *St. Petersburgh*, it
is the same, in effect, as if that place had been inserted in the
policy as the port of ulterior destination. The right of election
was spent and gone, and could not be again exercised.

2. Nothing occurred afterwards to authorize the substitution
of *Stockholm* as the place of destination, or the consequent
change of voyage.

[*Emmet.* We do not pretend that any thing occurred to render
a change of the port necessary, nor do we offer any excuse for·
the change; we contend that we had right to do so, as a matter
of mercantile speculation.]

3. But the case is not varied in the result, by the fact of the
loss having happened while the vessel was in the common *iter* to
*St. Petersburgh* and *Stockholm*. Though much might be said,
if the question was entirely open, on what has been laid down
[**] Wooldrige v.  by Lord *Mansfield*,[**] yet it must be admitted, that a mere inten-
Boydell, Doug.
Rep. 16.         tion to deviate does not vacate a policy, if the loss happens be-
fore the vessel arrives at the dividing point. But the present
case may be distinguished from that of an intended deviation, in
two particulars: first, a mere intention to deviate does not affect

the *identity* of the voyage. The component parts of a voyage,
and those on which its *identity* depends, are the *terminus a quo*,
the *iter*, and the *terminus ad quem.* A mere intention to deviate,
deranges neither of these component parts of the voyage. But
if either of them is varied, the identity of the voyage is gone,
and the policy is vacated. Hence, if the *terminus a quo* is va-
ried, the policy will not avail, though the loss does not occur,
until after the vessel has reached the common track. So, if
the *iter* is changed, as in a case of actual deviation; and the
rule must be the same if the *terminus ad quem* be changed.

This variation of the voyage vitiates the policy, because it is
a substitution of a new contract, and enables the insurer to say,
*non in hœc fœdera veni.** The degree of risk, so far as it depends *Marshall,*185. Park, 387.
on the important peril of capture, depends much on the port or
country to which the vessel is bound, and this risk is very ma-
terially varied by a change of the *terminus ad quem* of the
voyage.

Secondly, a mere intention to deviate does not influence the
*locality* of the vessel. But the substitution of *Stockholm* as the
ulterior port of destination, did produce that effect. Had the
voyage to *St. Petersburgh* been only in view, it is probable
that the vessel would not have proceeded from *Carlsham,* but
have unloaded there. At any rate, it is not to be supposed if
the expedition to *Stockholm* had not been adopted, that the vessel
would have sailed at the very time, and have reached the pre-
cise place she was in at the time of her capture.

The substitution of voyage, therefore, instead of being like
a mere dormant and unexecuted intention to deviate, is the very
thing which has led the vessel to the place of jeopardy, and oc-
casioned her loss.

The opposite doctrine is, that if after the inception of the
risk, the vessel is in the proper *iter*, at the time of loss, it is no
matter *quo animo* she came there. Suppose, however, the *At-
lantic,* being furnished with *letters of marque,* had left *Carlsham*
in quest of a prize, and had been lost, would the fact, in that
case, that she was in the common *iter,* at the time of loss, have
prevented the policy from becoming void?

4. The present case does not differ in principle from that of a
change of voyage before the vessel has sailed from her original
port of departure. The substitution of a different *terminus ad*

NEWYORK,
August, 1814.

LAWRENCE
v.
OCEAN INS. Co.
* Doug. 16. 2
Term Rep. 30.
Silva v. Low, 1
Johns. Cases,
184. Henshaw
v. Mar. Ins.Co.
2 Caines' 274.

† Steinbach v.
Col. Ins. Co. 2
Caines' 130.
per Livingston,
J. Hogg v. Hor-
ner, Park, 421.
Mar. Ins. Co.
v. Tucker, 3
Cranch, 185.
per Johnson, J.

‡On Ins. 202.
note.
§ See Ingersoll's
trans. of Roc-
cus, 95. note
xx.

*quem*, in that stage of the voyage, it is admitted, clearly vitiates the policy.* This is sometimes said to proceed on the principle of a *non inception* of the voyage. This language may be correct when the insurance is *from* a place, but not where, as in this case, the insurance is *at and from;* more especially, where the *terminus ad quem*, mentioned in the policy, is, in fact, the one originally intended, but a different one has been substituted before the vessel sails. That the risk has its inception in the latter case, appears from the fact that the *premium* cannot be recovered back.†

Lord *Mansfield*, the author of the distinction between an intended deviation and a substitution of voyage, states the reason of the distinction in *Wooldridge* v. *Boydell*. He says, that " in the case of an intended deviation, the *terminus a quo* and the *terminus ad quem* remain the same." But speaking of a substitution of voyage, he says, "that was never the voyage intended, and, consequently, is not what the underwriters meant to insure."

Hence it appears, that the only reason why a substitution of a different *terminus ad quem*, at the port of departure, vitiates the policy, is, that it destroys the identity of the voyage; and the same principle equally applies to a subsequent change of the *terminus ad quem*.

5. The result, from a view of the whole subject, is, that if a vessel, at any period, abandons the voyage insured, and proceeds on a new enterprise, the protection of the policy is lost, and the assurers are not liable for a subsequent loss, though happening before the ship had departed from the common *iter*.

*Marshall*,‡ after citing *Roccus*§ and *Emerigon*,(a) quotes a passage from *Casaregis*, who observes, " The voyage is said to be changed when the master of the ship no longer pursues his first principal destination, as when the ship, with her cargo and first freight, no longer intends to go, nor actually goes to the des-

(a) Tom. 2. p. 56. c. 13. s. 14. *voyage change*. *Marshall* evidently cites the foreign writers from *Emerigon;* the whole passage in *Roccus, n.* 20. is as follows, and should be read in connexion with note 52: "*Et si navis in casu prædicto mutaverit iter, vel ceperit secundum viagium, vel convenerit, asportare alias merces in alium locum, vel alias assecurationes fecerit pro dicto secundo viagio, tun—n casibus prædictis assecuratores, pro primo viagio, amplius non tenentur, ita probat Rot. Gen. Decis. 25, &c. Nam cum navis diverterit ad extraneos actus dicitur mutasse iter, et plura viagia fecisse, et primum dicitur mutatum; et ampliat Rota, hoc procedere etiamsi fuit capitum secundum viagium licet non completum; nam cum fuerit deventum ad actum proximum, destinatio habetur pro profecta; cum potentia propinqua actui habeatur pro actu; limita tamen si mutetur exjusta causa, ut infra not. 52.*"

tined port;" and this, *Marshall* adds, is understood to be the law of *England*.

*Emerigon,*\* (c. 13. s. 14.) in the passage cited, treats of a *voyage changed*, and in the 11th section he speaks of a voyage altered or broken up before the departure of the vessel, and in section 15. he discusses the doctrine of deviation, (*changement de route*.) In the 14th section he must intend to speak of a change of a voyage after the vessel's departure. He says, "if the vessel sets sail for a different destination than that of the voyage insured, or if arrived off, or in sight of, the port of destination, she proceeds to another place, or if, when departing from the lawful route into which she had entered, the ship abandons her original destination, in order to proceed elsewhere, in all these cases the *voyage is changed*." He expresses his dissent from the opinion of *Roccus*, that a letting of the ship to freight for another place would be a change of voyage; he then cites the opinion of *Casa Regis,*(a) approved by *Marshall*, and he tests the identity of the voyage by reasoning, *à contrario*, that the voyage is always the same, when the captain, without losing sight of his first destination, departs from it only in the accessories, by touching at different places in the course of the route, in support of which he also cites the opinion of *Casa Regis.*(b)

In the 27th article of the ordinance of *Louis* XIV. it is declared, that "if the changing of the course of the voyage or ship happens by the order of the insured, without the consent of the insurers, they shall be discharged from the risk."†

In *Driscoll* v. *Passmore,*‡ and *Bevil* v. *Passmore,*§ and especially in the latter case, the question was made to depend, not so much on the propriety of the deviation, as on the inquiry whether the assured had abandoned the voyage; and it seemed to be taken for granted that if such was the case, it would be fatal.

In *Norville* v. *St. Barbe,*‖ it is stated by the counsel for the assurer, and not denied by the other side, that when the *terminus*

*Margin notes:*

NEWYORK, August, 1814.

LAWRENCE v. OCEAN INS. Co.

\* *Tom.* 2. p.56.

†2 *Peters' Adm. Dec. App.* 14.
‡1 *Bos. & Pull.* 200.
§ 1 *Bos. & Pull.* 313.

‖ 5 *Bos. & Pull.* 434.

(a) "*Mutari viagium tunc dicitur, quando primam principalem destinationem magister navis non sequitur; utpote quod navis cum onere et cum primis vecturis, ad locum destinatum amplius non intendat ire, nec eat. Disc.* 67. n. 24."

(b) "*Cum capitaneus, retento semper primo proposito et destinatione, in accessoriis t t iter illam non sequitur, mutando viam de recta in indirectam, vel plures scalas, plures portas attingendo; animo tamen et intentione prosequendi viagium ad metam destinatam.*"

NEWYORK,
August, 1814.

LAWRENCE
v.
OCEAN INS. Co.
* 1 Campb. N.
P. 454. and
Park, 226.

ad quem is at any time abandoned, the policy is thereby forfeited, and that there is a distinction between such a case and that of an intended deviation.

In *Blackenhagen* v. *London Assurance Company*,* Lord *Ellenborough* nonsuited the plaintiff, not because the vessel had departed from what, under the circumstances, might have been the allowed *iter* had she kept the port of original destination in view, but because the voyage insured had been abandoned. The plaintiff afterwards brought his action in the court of common pleas, and Sir *James Mansfield* submitted the cause to the jury upon the point whether or not the plaintiff had abandoned the voyage insured.†

† 1 Campb. N.
P. 564.
‡ 3 Mass. Rep.
409.

In *Stocker and others* v. *Harris*,‡ the insurance was from *Boston* to the *Canaries*, and at and from thence to any port or ports in *Spanish America*, and at and from thence to her port of discharge in the *United States*, under whatever papers, &c. The vessel went to the *Canaries*, and there obtained *Spanish* papers, and sailed for *Vera Cruz*, where she arrived, and landed her outward cargo; from thence she sailed for the *Havanna*, and in her passage to that port, but before she left the track she must have taken if coming to the *United States*, she was lost. It was held that the outward voyage terminated at *Vera Cruz*, and the sailing for the *Havanna* was a new and distinct enterprise, not protected by the policy, and a deviation from the voyage insured.

*T. A. Emmet*, in reply, said this was a *floating* policy. It was not a case of an election. The object was to leave the *terminus ad quem* undefined and uncertain, until the last moment, for the benefit of the assured, provided he did not subject the insurers to a second risk. Mere intention to change or deviate does not subject the insurer to any new or second risk. *Change of voyage* is where the policy never attaches, but a *deviation* is after the risk has attached.

§ De Assec. not.
20. 52.

*Roccus*§ most certainly considers a change of voyage, after the risk has commenced, as a deviation. The definition of a deviation, laid down by the defendants' counsel, is too narrow.

‖ Park, 6th
Ed. 387.

*Park*‖ defines a deviation to be "a voluntary departure, without necessity, or any reasonable cause, from the regular and usual course of the voyage insured;" and he is supported by

NEW-YORK,
August, 1814.

LAWRENCE
v.
OCEAN INS. CO.
* Doug. 288.

*Roccus*, and the authority of Lord *Mansfield*, in *Lavabre* v. *Walter*.* The substitution of another voyage, after the risk has commenced, is a deviation, because the insurer is not to incur a second risk. So long as he continues exposed to the same risk he is bound, and no longer. After the voyage commences, the insured has a *locus penitentiæ*, and a mere intention to deviate will not conclude him. The positions cited from *Casa Regis*, *Roccus*, and *Emerigon*, are not the law at this time, in *England*, nor here.

The case of *Thellusson* v. *Ferguson*† is remarkably analogous, and is conclusive on the point, that here was a mere intention to deviate, and the vessel having been lost before she came to the dividing point, the policy is not vacated.

† Doug. 361.

Until some act is done to put the insurer on a different risk, it is no more than an intended deviation, and the true mode of testing the matter is, to inquire whether there has been any alteration or change of risk. If there has not, and the risk was the same, what ground is there for objection or complaint on the part of the insurer?

THOMPSON, Ch. J. delivered the opinion of the court. The insurance in this case is upon the cargo of the ship *Atlantic*, on a voyage, as described in the policy, at and from *New-York* to *Gottenburgh*, and at and from thence to one port in the *Baltic*. On the arrival at *Gottenburgh*, the assured elected *St. Petersburgh* as the ultimate port of destination, and sailed for the same; but meeting with adverse winds, was obliged to put into *Carlsham*, where the vessel was compelled to winter; and before leaving that place, it was determined by the supercargo to go to *Stockholm*, instead of *Petersburgh*; and the principal question in the cause is, whether this was a substitution of a new voyage so as to discharge the underwriters.

There were, however, several questions raised in the course of the trial, which may require some notice.

The objection to the sufficiency of the preliminary proofs was properly overruled. The usual and customary documents accompanied with an affidavit, showing the *interest* of the assured, were exhibited to the underwriters, together with a copy of a letter from the master of the *Atlantic*, received from Messrs. *Parish & Co.*, and which was the only evidence of *loss* in their possession; and this was all that could be re-

quired.   The clause in the policy making preliminary proof necessary, before payment of the loss can be demanded, requires only reasonable information to be given to the under- writers, so that they may be able to form some estimate of their rights and duties, before they are obliged to pay; this clause has always been liberally expounded, and is construed to require only the best evidence of the fact which the party possesses at the time.   Such has been the uniform construction put upon it by this court.  (2 *Johns. Rep.* 136.  8 *Johns. Rep.* 317.)   The question of seaworthiness was properly submitted to the jury, and the verdict does not appear to be so much against evidence as to justify the setting it aside on that ground.

The objection to the reading certain letters from the corres- pondence produced by the plaintiff was properly overruled. These letters were drawn out from the plaintiff under a rule of court obtained on the application of the defendants, and which required the plaintiff to produce, *under oath*, all letters in his pos- session, or under his control, which related to, or concerned, the ship, or in respect to the voyage in the declaration mentioned. This was analogous to an answer in chancery; and it is an invariable rule that, where an answer is given in evidence in a court of law, the party is entitled to have the whole of his an- swer read.   It is to be received as *prima facie* evidence of the facts stated in it; open, however, to be rebutted by the oppo- site party.  (*Peake's Ev.* 35—37.  2 *Esp. N. P.* 21.)

Whether there was an unnecessary delay at *Gottenburgh*,(a) and whether the *Atlantic* sailed from thence under the protec- tion of a *British* convoy, were questions properly submitted to the jury, and their verdict is fully warranted by the evidence in the case.

These are all the questions made upon the argument, except that which relates to the change of voyage, which I am now to notice.

(a) In *Rucker and another* v. *Allnut,* (15 *East,* 278.) it was decided that, under a policy on goods at and from *London* to any port or ports, place or places, in the *Baltic*, back- wards and forwards, &c. with leave to touch and stay at any ports and places for all purposes whatsoever, the insured may wait at any port or place whatsoever for *informa- tion* as to what port in the *Baltic* the ship might safely proceed to discharge her cargo, such being the object and peculiar nature of the adventure; though, in an ordinary policy upon a definite voyage, those general words would not authorize a stay to pro- cure information as to the ulterior destination of the ship.

It is necessary, in order to arrive at a correct conclusion on <span>NEWYORK,</span> this question, to ascertain, in the first place, what is the voyage <span>August, 1814.</span> described in the policy. It is a voyage from *New-York* to *Got-* <span>LAWRENCE</span> *tenburgh*, and at and from thence to one port in the *Baltic.* <span>v.</span> The *terminus ad quem* is left open, and to be filled up at the <span>OCEAN INS. Co.</span> election of the assured. The assured were certainly not bound to make this election before leaving New-York. The *Atlantic*, therefore, sailed on the voyage insured, and was under the policy, at all events, until her arrival at *Carlsham*. It is unnecessary to say at what time the assured were bound to make this election of the ultimate port of destination. The election, in fact, was made at *Gottenburgh*, and the assured were bound by that election. (3 *Com. Dig.* 614.) We must, therefore, consider the policy as if *St. Petersburgh* had been inserted; and it is to be regarded one entire voyage, commencing at *New-York* and terminating at such port in the *Baltic* as the assured should elect. There is nothing in the case to warrant us in considering the policy as upon two distinct voyages; the one from *New-York* to *Gottenburgh*, and the other from thence to a port of discharge. There is one entire risk for one entire premium; but the result in the case would be the same whether the voyage is considered in the one light or the other.

Assuming, then, the voyage described in the policy to be from *New-York* to *St. Petersburgh*, how or where has that voyage been changed, or another substituted, and on which the *Atlantic* was, in fact, sailing? In all the cases on this subject which have fallen under my observation, the *termini* of the voyage have been described in the policy; and, generally, the question has been as to the effect of an intention to go to some intermediate port, out of the usual course of the voyage, intending, however, ultimately to go to the *terminus ad quem* mentioned in the policy. The rule seems to be well settled, both in *England* and this court, that where the *termini* of the voyage described in the policy, and of the intended voyage, remain the same, that any designed deviation, whether formed before or after the commencement of the voyage, would not vitiate the policy. (1 *Johns. Cas.* 184. 2 *Caines' Rep.* 274. 3 *Cranch*, 384. 2 *H. Bl.* 343. *Park*, 316.)

The rule laid down by *Millar*, (389.) is, that if the alteration of the voyage takes place before the *risk* commences, it becomes a different voyage; but if after, it is only a deviation. When

NEWYORK,  there is a substitution of a different voyage, the policy never
August, 1814.  attaches, and the assured is, of course, entitled to a return of
LAWRENCE  premium.    Did the risk in this case commence?  Of this there
v.
OCEAN INS. Co.  can be no doubt.    The vessel was, unquestionably, on the
voyage insured until she arrived at *Gottenburgh;* the policy,
therefore, attached.    There was an inception of the risk insured
against, and there could be no return of premium, (*Marsh.* 230.)

Had the policy in this case been originally filled up with *St.*
*Petersburgh* as the port of delivery, or had that port been elected
as the *terminus ad quem*, before the *Atlantic* left *New-York*, and
afterwards, but previous to her sailing, the assured had changed
the voyage to *Stockholm* instead of *St. Petersburgh*, this would
have been substituting a new voyage; the risk would never
have commenced, and there must have been a return of pre-
mium.    It would then have been like the case of *Wooldridge* v.
*Boydell*, (*Doug*. 16.)

The insurance there was from *Maryland* to *Cadiz*, but the
whole evidence in the case showed that the voyage was for
*Falmouth*, and that there was no intention whatever of going to
*Cadiz*.    The voyage described in the policy was, therefore,
never commenced.    Lord *Mansfield* told the jury, that if they
thought the voyage intended was for *Cadiz*, they must find for
the plaintiff, but if they should think there was no design of
going to *Cadiz*, they must find for the defendant.

There is, I am persuaded, no case to be found where a change
of voyage, after the commencement of the one described in the
policy, and after the policy has attached, has been held to be a
substitution of a new voyage.    If in such case the alteration
actually takes place, it is a deviation which discharges the un-
derwriter, and if not, it is only an intended deviation, which
does not affect the policy.

I have thus far considered the case on the ground that the
voyage insured is to be viewed as one entire voyage from *New-
York* to some one port in the *Baltic*, at the election of the as-
sured; and this, I think, is the true ground upon which it ought
to be placed.    But, as I have before said, the result will be the
same if the voyages be considered distinct.

Suppose the policy had taken up the vessel at *Gottenburgh,*
and described the voyage from thence to *Petersburgh*, the po-
licy would have attached, and the risk commenced.

The sailing from *Gottenburgh* was with an intention of going to *St. Petersburgh*, and it was not until after her arrival at *Carlsham* that there was any change of intention, or a determination to go to *Stockholm*. The vessel was then on her direct course to *St. Petersburgh*, and continued on such course until her capture. There was, therefore, only an intended deviation in consequence of information received by the supercargo after leaving *Gottenburgh*.

The election of *St. Petersburgh* as the port of discharge was made at *Gottenburgh*, and had the ship left *Gottenburgh* with a determination to go to *Stockholm* instead of *St. Petersburgh*, it might have been a change of voyage; the policy would not in such case have attached, or the risk commenced. The *terminus ad quem* would have been altered *before the commencement of the voyage*, and the vessel would not have entered upon the voyage described in the policy.

It is, I believe, a position not to be controverted, that the legal effect of an alteration of the voyage upon the policy, is, that it never attaches. (3 *Cranch,* 368.) It would seem to follow, as a necessary conclusion, that when the policy does attach, any subsequent alteration of the voyage must be either a deviation or an intended deviation; and I think I have sufficiently shown, that in the case before us the policy did attach. The cargo was clearly at the risk of the underwriters from *New-York* to *Gottenburgh,* and from thence to *Carlsham.* I therefore entertain a strong and decided opinion, that the determination formed at *Carlsham* to go to *Stockholm,* instead of *St. Petersburgh,* was only an intended deviation, and that the loss having happened before the arrival of the vessel at the dividing point, the underwriters are responsible. The plaintiff is accordingly entitled to judgment.

VAN NESS, J. I cannot assent to the opinion of my brethren. We all agree that the assured, having elected, at *Gottenburgh,* to proceed to *St. Petersburgh,* he was not at liberty afterwards to change the final destination of the ship. This is the only point in the case upon which I have doubted ; but I am satisfied that the weight of argument is on the side of the assured, and I shall proceed to consider this as an insurance on a voyage from *New-York* to *Gottenburgh,* and from thence to *St. Petersburgh.* The question is, whether the setting sail from *Carlsham* for *Stockholm,*

NEWYORK,
August, 18,4.
LAWRENCE
v.
OCEAN INS. Co.
and not for *St. Petersburgh*, was merely an intention to deviate, or whether it was an alteration of the original plan of the voyage, or a different voyage from that described in the policy; if the former, the assured are entitled to recover; if the latter, they are not.

The facts, in relation to this part of the case, are, that after this vessel had wintered at *Carlsham*, it was determined to abandon the voyage to *St. Petersburgh*, and go to *Stockholm*, for which latter place she actually sailed. The testimony of the captain, on this point, is clear and decisive. " About the 2d of *May*, 1811, the navigation at *Carlsham* opened, and about that time the vessel sailed for *Stockholm*, the voyage to *St. Petersburgh having been given up.*" It appears, also, that when the vessel " sailed in the spring for *Stockholm*, a clearance for that place had been obtained at *Carlsham.*"

Considering the voyage insured, then, as being from *New-York* to *Gottenburgh*, and thence to *St. Petersburgh*, I had supposed, after the pause which had been made at *Carlsham*, in the prosecution of it, (though for a justifiable cause,) after the determination there formed of abandoning the port of destination and *substituting* a different port, and after procuring a clearance for such substituted port, and actually sailing from *Carlsham*, in pursuance of such determination, that the underwriters could never be called upon to pay for any subsequent loss. That this was not a mere unexecuted intention to deviate from the voyage insured, will, I think, appear from a brief review of some of the cases in which this branch of the law of insurance has been considered. In the case of *Wooldridge* v. *Boydell*, (*Doug.* 16.) Lord *Mansfield* says, " a deviation merely intended, but never carried into effect, is as no deviation. In all the cases of that sort, the *terminus a quo* and *ad quem* are certain and the same." In the case of *Kewley* v. *Ryan*, (2 *H. Bl.* 343.) it is held, that " where the *termini* of the intended voyage were really the same as those described in the policy, it was to be considered as the same voyage, and a design to deviate, not effected, would not vitiate the policy." In *Sylva* v. *Low*, (1 *Johns. Cases*, 184.) the late chief justice of this court observed, that " the courts have gone a considerable length towards giving us a precise and definite criterion by which we can test the identity of a voyage. While the *terminus a quo* and the *terminus ad quem* are the same

with the *termini* of the voyage described in the policy, the voyage *intended* and the voyage *insured* are the same, notwithstanding any proposed deviation, or touching at any intermediate port, out of the usual and direct course of the voyage." The opinions of *Lewis*, Ch. J. and *Radcliff*, J. are to the same effect. The same language is held by the court, in the case of *Henshaw* v. *Marine Insurance Company.* (2 *Caines' Rep.* 274.) " The previous intention to touch at *Halifax* did not make it a different voyage, as the *termini*, as well as the substantial object of the voyage described, were the same." The like doctrine is laid down, with great force and precision, by three of the judges of the supreme court of the *United States*, in the case of the *Marine Insurance Company of Alexandria* v. *Tucker.* (3 *Cranch*, 384.) *Washington*, J. says, " If the ship sail from the port mentioned in the policy, with an intention to go to the port or ports also described in the policy, a determination to call at an intermediate port, either with a view to land a cargo, for orders, or the like, is not such a change of the voyage as to prevent the policy from attaching, but is merely a case of deviation, if the intention be carried into execution, or be persisted in after the vessel has arrived at the dividing point."

From these cases, to which many more might be added, the following principles may be deduced:

1. That where the *termini* of the voyage are preserved, an unexecuted intention to deviate does not destroy the policy;

2. That when the *termini* are abandoned, and a new or independent voyage is determined upon and commenced, from that moment the protection afforded by the policy ceases, and the underwriter is discharged;

3. That there is no such thing as a deviation in any case where the identity of the voyage is not preserved, because there cannot be a deviation from a voyage which the assured does not intend to perform.

The application of these principles to the present case will show, decisively, that the plaintiff cannot recover. The *termini* were not preserved; the port of delivery was totally abandoned, and a new port substituted, for which the ship actually sailed. It would be a departure from all correct rules of expression to say, here was an intention to deviate from the voyage to *St. Petersburgh*, when all intention to perform such a voyage was un-

*(margin note)* NEWYORK, August, 1814.

LAWRENCE
v.
OCEAN INS. CO.

NEW YORK,
August, 1814.

Lawrence
v.
Ocean Ins. Co.

conditionally renounced. It is supposed, however, that if a determination to abandon the *terminus ad quem*, and to end the voyage at another port, be made after the vessel has sailed upon the voyage insured, and a loss happens before she arrives at the point of divergency, this is not a change of voyage, but a mere intention to deviate; and I am aware that, in some cases, expressions may be found which countenance such an idea. It is necessary, therefore, to consider this part of the case a little more at large.

A deviation is a departure from the usual course of the voyage insured, without necessity. Where the identity of the voyage insured is preserved, and the assured, either before or after the ship sails, intends to perform it circuitously, by going out of the common *iter*, if a loss happen before the arrival at the point of separation, this is a mere intention to deviate; and, for this plain and obvious reason, the identity of the voyage insured is not deranged; neither the beginning, nor end, nor route, are altered; it is a mere act of the mind, a bare intent to proceed to the *terminus ad quem*, but, in some stage of the voyage, to depart from the ordinary route. In every case, however, (and I affirm it without exception,) where such an unexecuted intention has been held not to vitiate the policy, it will be found that the *terminus ad quem*, mentioned in the policy, was not abandoned, but that the vessel intended, ultimately, to proceed to it. In case a determination is formed to deviate, no matter whether before or after the voyage is commenced, provided the voyage insured is intended to be performed, the ship may be said to be upon her voyage, though not in the customary route; but with what propriety or reason can it be said, if the *terminus ad quem* is completely abandoned, a different port of destination adopted, and the vessel proceeds, in pursuance of such a change of plan and design, that she is pursuing the voyage insured?

It so happens, in this case, (at least so is the evidence,) that the *Atlantic* was in the common route to *St. Petersburgh* and *Stockholm* when she was taken. But, I would ask, was she on a voyage to *St. Petersburgh* or *Stockholm?* Most certainly she was not prosecuting a voyage to both ports. I do not mean that she was not on a route common to both *St. Petersburgh* and *Stockholm*, as far as she had proceeded, but, I ask, on what voyage was she sailing? She determined, while at *Carlsham*, not

to go to *St. Petersburgh ;* she set sail from that place with the intention of going to *Stockholm,* and took a new clearance for that port, nor was it until many hours after she had been upon her new voyage that she was captured.

Whether the voyage insured has been abandoned is always a question of fact, and so it has often been decided. The fact that it was abandoned being once established, there is an end of the liability of the assured. Can there be a difference, in principle, at what time, in relation to the local position of the ship, this abandonment takes place? In the case of *Wooldridge* v. *Boydell,* the insurance was at and from *Maryland* to *Cadiz.* It was clear, the voyage was never intended for *Cadiz.* The determination not to go to *Cadiz* was probably formed before the vessel sailed; she was taken, however, before she reached the dividing point. It was held, that the underwriters on the policy were not liable, and that it was not a case of mere intended deviation, but that the voyage intended was different from the voyage insured. *Buller,* J. observes, "This is a question of fact; there cannot be a deviation from what never existed. The weight of evidence is, that the voyage was never designed for *Cadiz.*" The inquiry was not, when or where was the voyage insured given up; but was it, in fact, given up? That being shown, the underwriters were discharged. This is clear, not only from the case itself, as reported, but also from what fell from Mr. Justice *Buller,* in the case of *Way* v. *Modigliani,* (2 D. & E. 32.) In speaking of the case of *Wooldridge* v. *Boydell,* he remarks, that it was there decided, "that if a ship insured for one voyage, sail upon another, although upon the same track part of the way, and she be taken before she reach the dividing point of the two voyages, the policy is discharged. That was a stronger case than the present; for there the *very intention* of sailing upon a different voyage than the one insured vacates the policy." There, as in the case before us, it might have been urged, with equal force and plausibility, that the master might have changed his mind before he came to the dividing point. There was still left a *locus penitentiæ,* that he might have received new instructions before an actual deviation had taken place, not to go to *Falmouth,* but to *Cadiz ;* or he might himself have come to such a resolution. The ship was taken in the *Chesapeake,* in the common track, both to *Falmouth* and *Cadiz.* Her going to *Falmouth,* or *Boston,* rested solely on naked, un-

executed intention, and yet the underwriters were held not to be chargeable with the loss.

Let us take a closer view of this subject. What ground is there for a distinction in the plan formed for going to a port, different from the one insured, whether it be before or after the voyage is commenced? If *before,* the ship is said never to have sailed upon the voyage intended to be insured, and, therefore, the assured are not liable; if *after,* then, from the moment the new voyage is entered upon, the ship is no more upon the voyage insured than in the former case.

It may be true in this, and in many other cases, that the ship, for a few hours, perhaps a few days, may be on a route common both to the original and new port of destination; sometimes by design, sometimes by accident. But is not the voyage insured as effectually changed as if the vessel had proceeded on a totally different route?

When the voyage, upon which the ship sailed from the port of departure, is different from that described in the policy, if it were an insurance "*from*" only, there would, of course, be a return of premium, because she never was at the risk of the assurer. But when such a change takes place after the risk has attached, there will be no return of premium; and this, in my opinion, is the only difference in the change of voyage, *before* or *after* it has been commenced. A return of premium would depend, however, upon the form of the insurance, even where the determination to change the voyage described in the policy, is formed before the ship sails. In the case of *Wooldridge* v. *Boydell,* for instance, there was no return of premium, because, as the insurance was *at* and *from Maryland,* the policy had attached as much as if the vessel had actually sailed upon the voyage insured.

The case of *Blackenhagen* v. *London Insurance Company,* (*Park,* 226, 227. 1 *Campb. N. P.* 454.) appears to me to support the opinion I have expressed. That was an insurance from *London* to *Revel.* The ship sailed for the *Sound,* and arrived there on the 27th of *October.* On the 11th of *November* she proceeded towards *Revel,* and two days after, while on the voyage thither, information was received that an embargo was laid on all *British* ships in the ports of *Russia,* in consequence of which the ship returned to *Copenhagen,* and some days after

sailed for *England*, and was lost. The return, under the circumstances of this case, was justifiable, but it appearing that the voyage to *Revel* was never intended to be performed, it was held by Lord *Ellenborough* that there was no colour for charging the underwriters, subsequently to her setting sail from *England;* that this was a contract for a voyage out, and although a ship from necessity might be allowed to take a circuitous route, yet the ultimate point of destination must ever be the same; that such necessity might, perhaps, even justify a return to *England,* if it could be proved, satisfactorily, that it was the intention of the parties to seize the first favourable opportunity of returning to *Revel.* This cause was afterwards tried before Chief Justice *Mansfield,* who left it as a matter of fact to the jury, whether the ship had abandoned the voyage or not. Here, then, is a case, where the voyage insured was abandoned, after it had been commenced, and a great part of it actually performed.

Let us suppose, for a moment, that in this last case the master, instead of determining to return to *England,* had relinquished the voyage to *Revel,* with a view to go with his vessel and cargo to *Stockholm,* and there to terminate the voyage, and that, after proceeding for several days, in pursuance of such determination, but happening, at the same time, also, to be on the route to *Revel,* he had been captured, would this have been considered as a mere intention to deviate, or as an actual change of voyage? The principles upon which this case was put by the judges before whom it was tried, leave little or no doubt that it would have been held to be a change of voyage. They put it expressly upon the fact, not whether there had been an actual deviation, but whether the ship did intend to go to *Revel,* the port to which she was originally bound, and if this was *not* her intention, they then considered the voyage as abandoned, and the underwriters discharged. The case of *Stocker v. Harris* (3 *Mass. Rep.* 409.) appears to me to support the same doctrine. (See, also, note in *Marsh.* 201. *Amer.* ed.)

In further illustration and support of the principles and reasons upon which my opinion is founded, let it be supposed that a ship is insured on a voyage from *New-York* to the *Cape of Good Hope,* and that she sets sail accordingly; that when she arrives at the narrows she is overtaken by a boat, despatched by her

owners with new instructions from them to the master, directing him to proceed to *Canton*, and not to go to the *Cape of Good Hope*, accompanied with a new clearance, and such other documents as are usually procured for an *East-India* voyage, and that, being delayed by some injury to his ship, for a week or two, he again sets sail upon the voyage to *Canton;* let it be supposed, further, that, within a few days' sail of the *Cape of Good Hope*, and in the common route to both ports, the ship is lost, can it be possible that the underwriters would be liable for the loss? I think not ; and if they could not in the case I have put, most certainly they are not in the case before us, unless it is meant to go the length of saying, that there can be no such thing as a change of voyage, as distinguished from an intent to deviate, after the ship has sailed.

Whether the risk in this case was increased by the change of voyage is immaterial. It is worthy of remark, however, that the degree of risk, so far as it respects the peril by capture, depends, not unfrequently, upon the country to which a vessel is bound. *Sweden* and *Russia* have, alternately, been the allies and enemies of both *France* and *Great Britain*, and the danger of capture may have been essentially increased, in this instance, by the substitution of *Stockholm* as the final port of destination.

Again, whether this vessel would have sailed at the moment she did, in case the voyage to *St. Petersburgh* had not been abandoned, it is impossible to say. If she had not, who can say that she might not have escaped capture ? All the preparatory measures of the master, before he left *Curlsham*, and his whole conduct, were founded on the plan of a voyage to *Stockholm*, and not to *St. Petersburgh*. How far these circumstances may have affected the sailing of the vessel it is impossible to determine. For aught that is known to the contrary, the risk of the underwriters may have been essentially enhanced.

After as attentive a consideration of this case as I am capable of giving it, I think it a clear one for the defendants.

PLATT, J. not having heard the argument in the cause, gave no opinion.

Judgment for the plaintiff.