The opinion of the Court was delivered by
Bay, J.
As the arguments of counsel, which were long and ingenious, brought a great variety of important points before the Court, I shall endeavor to simplify and condense the case in as narrow a compass as possible, consistent with justice to its merits.
It appeared from the report of the Judge who tried the case in the Circuit Court, as well as by the concession of the parties in the argument, that on the 26th of December, 1810, the plaintiffs, Lawson & Co., gave an order to the defendants, M’Grath and Jones, to import, for their account, from Liverpool, a quantity of crockery and glass ware, particu^11'^ se^ and ^described in an invoice which accompanied the order; for which the plaintiffs, as alleged, were to pay defendants, on their arrival, with ten per cent, advance on the face of the invoice, with all charges. The plaintiffs also gave orders, that the property should be insured as soon as shipped. To this order and instructions the plaintiffs subscribed their names when they delivered it to the defendants. And to show that the defendants, on their part, undertook *341 to comply with, and execute this order for the plaintiffs, a copy of a letter in the hand-writing of one of the defendants, dated 21th December, 1810, said to have been taken from their letter book, was produced, addressed to their correspondents, Green and Wainwright, in Liverpool, in which, they ordered eighty crates of earthen ware, and four casks of glass ware, to be shipped on board of some good American vessel as soon as possible, for account of the plaintiffs, Lawson & Co. They also gave directions to their correspondents concerning the funds, out of which they were to be paid for this consignment, namely, out of the balance of a private account due the defendants, and out of the proceeds of a ship, called the Gustavus, then in Liverpool, which they were directed to sell and dispose of, for account of the owners of said ship, of which defendants were part owners, and had the direction. After giving their directions, the letter expresses the fears of the defendants, that another non-intercourse act would be passed, preventing the trade between this country and Great Britain; in which event, they say to their correspondents, they will be governed accordingly, as they should receive information thereof. In the further progress of this business, it appears that a letter covering the order of B. W. Lawson & Co., went safe to the hands of Green and Wainwright, who, it appears, put it into the hands of a manufacturer, a Mr. Devenport, to be duly executed, which was accordingly done, and the packages all made up with good faith, and marked ready for shipping, with the initials, B. W. L. & Co. On the 15th *of February, 1811, Green and Wainwright answer the defendant’s letter, covering the order of the 26th December preceding, and said, it shall be attended to whenever the advices from America will warrant the expectation of their being admitted.
At this stage of the business, it is necessary to advert a moment to the relative situation of the United States with Great Britain, immediately before and at the time when this order for the shipment of these commodities were given. In March, 1809, the non-intercourse act passed, prohibiting all intercourse between this country and England, on account of their oppressive orders in council, with a view to bring that government to a sense of duty, and a due regard to the law of nations, which they' had so shamefully violated. It, however, contained a clause which authorized the President, by his proclamation, to suspend the operation of it, whenever the governments of Great Britain or France should repeal or modify their decrees and orders in council, so as to do America justice in her commercial relations. In consequence of the convention signed by Mr. Erskine, with the United States, the President did think it proper to issue his proclamation, taking off the restrictions of the former acts, and restoring the commercial relations between the two countries; this proclamation bears date the 2d November, 1810, about nineteen months after the above restrictions had been imposed by the Act of 1809. It was in this interval of lawful commerce, that the order was given for the importation of the goods in question ; and this will explain the reasons why the precautions were taken by defendants in their letter of December, 1810, wherein they express their fears that another embargo or non-intercourse act might again take place. In which event they were to to govern themselves by circumstances, as well as the reply of Green and Wainwright to them, in which they say, that whenever advices from *342 America would warrant their admission, the order of the goods should be executed. Thus far, it is admitted that all ^parties acted with good faith towards each other; and the manufacturer, (Mr, Devenport,) to whom the orders were given by Green and Wainwright, went on and finished the wares for exportation, and had them all packed up, and marked ready for exportation, with the initials of B. W. L. & Co. It appears, however, that Mr. Devenport did not complete this order till the 17th July, 1812; for, on that day, his bill of parcels to Green and Wainwright bears date. Unfortunately, however, this convention signed by Mr. Erskine, was disavowed by his government, and the non-intercourse law went again into operation, on the 2d February, 1811. Thus matters remained till war was declared on the 18th of June, 1812.
On the 13'th August following, 1812, Green and Wainwright wrote to defendants, informing them, that by desire of Mr. Barker, one of the owners of the Gustavus, they had shipped a cargo of goods to them, and, among other things, the crockery and glass ware, for account of the. owners of the Gustavus, inclosing the bill of parcels from Devenport, and a bill of lading for the whole, addressed to, and consigned to them, thereby running all the risks of war and capture, and throwing all the responsibility on them, the defendants, and Mr. Barker, one of the joint owners of the Gustavus.
In October, 1812, the ship Anna, Captain Emmerson, on her passage for Charleston was captured by an American privateer, and carried into Savannah, as a good and lawful prize, for contravening the laws then in force against carrying on commerce with Great Britain. On the 2d January, 1813, the Act passed, remitting all penalties and forfeitures, for the importation of goods, by bona fide American citizens, between the 23d June and the 15th September, 1812. The ship Anna, fortunately, had sailed from England between these periods mentioned in the Act of. January, 1813, viz., in August, 1812. In consequence of which, the cargo was claimed by the defendants, as consignees and owners ; and it was afterwards given up to them, *in February, or March, 1813. After this, Mr. Isaacs, the survivor of the house of B. W. Lawson & Co., demanded the crockery and glass ware from the agent of the defendants, Mr. Budd, in Charleston, but he refused to deliver them up, alleging they were shipped for account of the owners of the Gustavus, and not on account of the plaintiffs.
These, I believe, are the principal and leading facts of this case. There may be some minor or secondary ones, which may have been omitted, some of which, however, will be taken notice of hereafter. In consequence of thisx refusal to deliver up the crockery and glass ware, on the part of the defendants, the present action was brought, and the jury, under the direction of the presiding judge, found a verdict for the plaintiffs to the amount of the first cost on the invoice, with a profit from 230 to 250 per cent.
The present is, therefore, a motion for a new trial on various grounds.
As I set out by observing, that I would condense this case as much as possible, I shall only observe upon the principal points of it, and as much of them only as has enabled this Court to make up its mind upon the main question.
1. The first point taken by the counsel in favor of the motion for a *343 new trial was, that this was not a contract binding under the statute of frauds. It is to be observed, that in mercantile transactions, in which the greatest part of the commerce of the world is carried on by merchants residing in foreign countries, and at a great distance from each other, by letters, instructions, and a mutual correspondence with each other, and greater latitude of construction is allowable, under the statute of frauds, than in contracts for the sale of lands and goods ; or in eases where there are independent covenants to be performed by each party. And without this liberal construction, trade and commerce never could be beneficially carried on. In the present case an invoice of wares and merchandise is made out, and signed by the plaintiffs in this action, *vvith a request, that defendants should import the articles contained in it for their account, accompanied with an engagement to pay ten per cent, advance upon the first cost, and all charges upon the importation. Annexed to this letter is an acknowledgment of the receipt of the above order of the 26th December, 1810, and stating that it had been forwarded per ship Sally, Captain Webber, brig Resolution: this is in the hand-writing of one of the defendants. If I understand this memorandum correctly, it is to be understood, that he had forwarded the order by the Sally, and a duplicate by the Resolution, according to mercantile usage. And he further adds, that they were to receive ten per cent, advance on the face of the original invoice, and all charges; and underneath is the copy of a letter from defendant’s letter book to Green and Wainwright, the 21th December, 1810, desiring them to execute this order, and send out the wares to B. W. Lawson & Co., and directing the funds out of which were to be paid the amount. But it was said this letter was not signed by the defendants, it was only a copy, and therefore not binding under the statute. The letter, however, of Green and Wainwright, which was received by defendants, and is now in Court, shows that such a letter had been sent and subscribed by them, ordering out these goods, which, connected with the above memorandum, was as much a signing to this contract, within the statute of frauds, as if the most formal instrument had been subscribed by both parties at the time. And so strong was this impression upon the minds of all the judges, at the time of argument, that they stopped Mr. Simons from going into all his grounds. It appears to me further, that these instructions given by plaintiffs, and the memorandum of one of the defendants, with the letter sent out to Green and Wainwright, contain all those terms and conditions, and all that certainty which the numerous cases quoted by the defendants’ counsel, seem to require and make necessary. I have, therefore, no doubt upon this branch of the case *under consideration, that this was a good and valid contract under the statute of frauds in its inception. Taking it for granted, therefore, that this was a binding contract, the next inquiry or point for consideration is,
2. Whether it was performed with good faith by defendants, as far as it was practicable ? and whether any thing occurred to prevent its final completion 1 Under this head, it does appear to my mind, that every thing which was incumbent on the defendants to do, was done, in order, finally, to carry this contract into full and complete execution. The orders to fulfil the undertaking of the defendants were forwarded to Liverpool without delay ; for the letter inclosing it was dated the day *344 after it was given, and sent on by the Sally, which I presume was the first ship that sailed afterwards, and a duplicate after this again by the brig Resolution. That these orders went safe to the hauds of their correspondents, and funds were provided for paying the amount of goods ordered. That their correspondents, Green and Wainright, obeyed their instructions, by placing the order in the hands of the manufacturer to be completed, and that 'this manufacturer did prepare the goods, and put them up in proper packages for shipping’, all marked with the initials of the plaintiffs’ names, B. W. L. & Oo. What more then could be done, finally, to fulfil this contract, than shipping the goods to the address of the plaintiffs in Charleston, when the manufacturer had completed his order on the 17th July, 1812 ? At this important stage of the case, let it be asked, could this be done, agreeably to the existing laws at that day ? And in answer to that question, I am confident and bold in saying it could not. And this is by far the most important point in this whole case. By a recurrence back to the different dates of the Acts of the American government, it will be found that the restriction imposed by the Act of 1809, and which had been suspended on the 2d November, 1810, was revived, and went again into operation on the 2d February, 1811, *and continued in operation at the period when war was declared between the two countries, on the 18th June, 1812. It therefore became unlawful for the correspondents of the defendants, Green and Wainright, to execute the order, finally, by shipping the goods to the address of the plaintiffs in this action. Here then it appears (as this was executory,) there was an end put to the contract by the supervening laws, preventing commerce between the two nations. If any thing further was necessary to abrogate this contract, there can be no doubt but the declaration of war, in June, 1812, put a period to all commercial executory contracts subsisting at that time between the subjects and citizens of the belligerent nations. The eases quoted and relied on by the defendants’ counsel are so strong that there is no getting over them. Bynkershock, (Qucesliones Juris Publici, Du Ponceau’s translation,) 23, lays it down, that war prevents all intercourse between nations. Again, he says, all commerce is at an end, and subjects the property to confiscation. In 1 Dali. 142, it is laid down, that a state of war puts an end to all executory contracts : and it was determined in a late case in New York, (a) that a state of war dissolved a partnership between an American and a British subject, whieh carries the doctrine still further than the abrogation of all executory contracts ,for the shipment of merchandise. I am, therefore, most decidedly of opinion, that these prohibitory A cts and the declaration of war put an , end to this contract to import these goods for the plaintiffs in this action. I say, not only prevented the lawful shipment of the goods, but also prevented the house in Liverpool from effecting the insurance which was an essential condition in the order when it was given : and this house in Liverpool would have been guilty of a breach of orders, if they had shipped these goods without insurance; (see all the authorities quoted from Park ;) they would have been liable for all the consequences. For plain *345 tiffs, a most ingenious argument was urged with great force and eloquence by the counsel for plaintiffs. That *all the Acts restricting commerce were temporary in their nature, and not permanent; that the objects of these laws was not to prevent trade, but to force the belligerents to do us justice. To this I answer, that, although the policy of these laws might have been the best that ever human wisdom or our country devised, yet as long as they remained in force, their restrictions and forfeitures were binding on the mercantile world, and no subsequent contingencies could vary them. The operation of law must remain in full force in all cases where it was declared to be binding, until repealed or altered: and any contravention of the law restricting trade and commerce, or the laws of nations, consequent upon a declaration of a war, must have been unlawful.
3. Another point of importance, springing out of the last ground, here presents itself for consideration. All the contracts in England had been fulfilled between Green and Wainright and the manufacturer ; they had been paid for by the funds of the defendants, and were on their hands a dead weight. Had they not a right then to make the most of them, and send them forward to any market in the world, were they could reimburse themselves for their advances ? I conceive they had this right, as the former contract was at an end. They did so by the advice of their friend, Mr. Barker, who chose to run all risks for his friends, and part owners of the Gustavus, in Charleston. By a most miraculous combination of circumstances, the goods arrived safe, and although liable to seizure and condemnation, were restored to the defendants, as consignees and real owners, who had run all the risks of forfeitures and penalties, by an Act, that, in the course of national affairs, could not be reasonably calculated upon. What right, then, had the plaintiffs to demand these goods, either in law or equity ? From the foregoing observations they had none in law, for the law of nations, and of the United States, were against them. And in a moral and equitable point of view, their right was equally groundless. *They had advanced no money; provided no funds; had run no risks as to penalties, or forfeitures, or insurance. Their whole claim seems to have been bottomed upon their cupidity, when every risk was at an end ; and then, and not till then, they claimed this property, and 230 or 250 per cent, advance, after folding their arms, and laying by in safety, for nearly two years, without ever inquiring or saying one word upon the subject. Is this, then, such a case as deserves the countenance of a court and jury ? I conceive not.
4. But it was contended, that the marks on the back of the bill of lading, and on the packages, showed that these wares were at last, and at all events, consigned to the defendants, for the use of the plaintiffs. These, I am free to confess, were strong circumstacces in favor of the plaintiff’s claim, according to the usage of trade in the day of peace and tranquillity. But in a period of hostile measures between nations, for the great purpose of obtaining justice on the part of the injured nation, and of war consequent on the refusal of that justice, it is evident that these peaceable and usual commercial rules and regulations must bend and give way to the more imperious necessities of States; and that these latter ones must form exceptions to the general rales of commerce between in *346 dependent nations. I am, therefore, strongly inclined to think that these marks and initials on these packages on the back of the invoice, are rather marks or proofs of the good faith of the defendants, originally, in executing this order for the plaintiffs, than badges of fraud in them. They are to me proofs, that they originally intended them for the plaintiffs, but from the operation of the laws, and declaration of war, as that contract was at an end, they had changed their intention, and shipped them for account of the owners of the Gustavus, who were willing to run all risks, and chances of forfeitures, rather than the goods should remain a useless weight and burden upon their hands, which the plaintiffs had never hinted they were willing to run.
Gogdell, for the motion. K. L. Simons, contra.
5. There is one other point in this case which I *shall just touch upon, at the request of my brethren, although I do not think it of great importance in this case, yet, as the 'point may be of more importance in other cases, it is of some consequence that it should be settled ; and that relates to the rejection of Barker’s letter, as one of the papers called for on the trial. It appears a notice had been given by plaintiffs to defendants, to produce all bills of lading and invoices upon the trial, and other papers which could throw light upon the subject matter in dispute ; and it appeared that one of the letters from Green and Waiuwright & Co., referred to one from Mr. Barker, part owner of the Gustavus, giving that house orders to ship the cargo of the Anna to defendants. This letter, the defendants’ counsel offered to give in evidence with the others, but it was rejected, on the ground that he was an interested person. Upon this last point, I am of opinion, that the law, as laid down by Phillips, 332, and in 11 John. 260, ought to govern the subject in our Courts in this country. That in all cases where papers are called for, which are in possession of one party, by another, they ought not to be garbled, but the whole produced, subject, however, to all legal exceptions when produced ; and that wherever a document or paper is referred to by any other, which is admissible evidence, such document or paper, so referred to, ought to be produced. Upon the whole case, however, I am decidedly of opinion, the plaintiffs are not entitled to a recovery, and that there ought to be a new trial.
All the judges concurred.

 We presume the New York case alluded to by his Honor, is that of Griswold v. Waddington, 15 John. 57. R.