WILLIAM C. HAMMATT, *Ex'or, versus* WILLIAM EMERSON.

A partial failure of consideration for a note, given in payment for land sold, not arising out of a failure of title, but out of fraudulent misrepresentations respecting the quantity of timber trees then upon it, may be given in evidence in defence in a suit upon such note, while it remains in the hands of the seller, or in the hands of one having no superior rights.

And if the purchaser makes a contract to sell a portion of the land to another, and gives to the seller in part payment, a note, signed by such other as principal, and the purchaser as surety, this does not affect the relations between the seller and purchaser, nor take away the right of the latter to set up fraud in the contract, as a defence.

The law does not make the vendor responsible in damages, for every unauthorized, erroneous or false representation made to the vendee, although it may have been injurious. To make the party liable, the representation must have been false, have been fraudulently made, and have occasioned damage.

And where one has made a representation positively, or professing to speak as of his own knowledge without having any knowledge on the subject, the intentional falsehood is disclosed, and the intention to deceive is also inferred.

An agreement, containing a guaranty, that there is a certain quantity of timber upon a tract of land, does not necessarily include the idea or authorize the inference, that the person making it, knows the fact to be, as the guaranty stipulates, that it shall be, for the foundation upon which business is to be transacted.

Hammatt *v.* Emerson.

A deed of a grantee of the State, cannot be considered as belonging to the archives of the State, and it cannot be proved by a copy made by the Land Agent.

Where a paper belongs to the archives of the State, proof of its contents may be made by a duly authenticated copy.

Letters addressed to a public officer in his official capacity, when received, become public documents and may be proved in like manner. But extracts or portions of them cannot be received.

Where letters have been written by the agents of the seller, and their contents made known to the purchaser as an inducement to make the purchase, the original letters only can be produced in evidence, without proof that they have been lost.

A copy of the decree of the Circuit Court of the United States, although not made in a case between the parties, is the only legal testimony to prove the facts stated in the decree.

The representations made by the agent of the plaintiff to the defendant may properly be given in evidence on the question of fraud. But the inducements which operated on the mind of the agent are not admissible.

When parol proof of admissions, made in conversations or declarations, is introduced, it is limited to what was said or done at the same time, relative to the same subject.

When proof is introduced respecting admissions made in and proved by bills and answers in chancery, letters and other written documents, the whole matter contained in such bill, answer, letter or other written document becomes testimony in the case, for a part cannot be received and a part excluded.

Inquisitions, examinations, depositions, affidavits and other written papers, when they have become proofs of its proceedings, and are found remaining on the files of a judicial court, are judical documents.

Where a deposition of a party to the suit, taken to be used in another court in a case between other parties, is offered in evidence in this Court by the opposing party, the impression is, that the whole deposition becomes evidence in the case.

AFTER the trial, and before the arguments on the questions of law, the plaintiff deceased, and William C. Hammatt, was appointed Executor, and prosecuted the suit.

" Assumpsit. Two counts founded on the following notes.

" Value received, we, Hazen Mitchell, as principal, and William Emerson, as surety, jointly and severally promise to pay William Hammatt or order, two thousand nine hundred and twenty-five dollars, on or before the twenty-ninth day of June,

in the year of our Lord one thousand, eight hundred and thirty-seven, and interest annually. June 29, 1833.

" $2925,00.                              " Hazen Mitchell,

" Witness, Daniel McCann."        " William Emerson."

" At the trial, before TENNEY J., after reading the note, the execution of which was admitted, the plaintiff rested.

" The defendant then opened his defence, and placed it on the ground, that the note declared on was obtained by fraud.

" The plaintiff then contended, that as by the admission of the defendant, there had been no rescinding or offer to rescind the bargain and sale, and no restoration or offer on the part of the defendant to re-deed or restore the land for which the note was given, that this defence on the ground of fraud, was not open to him. But the Court ruled otherwise.

" The defendant then introduced the deposition of George W. Coffin, taken Nov. 7, 1844, which is part of the case. The plaintiff objected to the third and fourth interrogatory and answer thereto, and to the admission of the copy of the deed A, and the agreement B, as not admissible; but the Court admitted them and they were read. Plaintiff. also objected to the 5th interrogatory and the answer and the admission of the copy of the assignment dated Dec. 2, 1832; but the Court admitted them. Plaintiff also objected to the 8th interrogatory and answer, and to the admission of the copy of the letter in paper C, or extract from William Hammatt's letter to said Coffin, dated March 20, 1828, and also of the letter in D, from same to same, dated July 3, 1828. Also the copy of the report of Eben Greenleaf and W. C. Hammatt dated June 28, 1828; but the Court admitted them.

" The defendant offered a deposition of the plaintiff given in another case, between said defendant and others and Warren and Brown, in relation to a sale of the same township now in question, and taken at the request of said Emerson on interrogatories proposed by said Emerson, and read therefrom the 4th interrogatory and answer, a part of the second interrogatory and a part of the second answer. Also the 3d and answer, the 6th and answer, a part of each of 6th only. The plaintiff

contended, that if any part of the questions or answers were read, all should be read, but the Court ruled otherwise.

"In another stage of the case, the plaintiff was permitted to read the remainder of the second question and answer, and he desired to read the remainder of the 6th question and answer, but the Court did not permit him so to do.

"He also offered and desired to read all the deposition or other parts, which he contended had a bearing on the case, but the Court ruled in relation to this deposition, that the plaintiff could read only such parts as go to qualify or explain the portions read by the defendant."

Paper A. referred to in the instructions of the presiding Judge.

"7th of March, 1833. I will sell township No. one, 10th range, at 45,000 dollars or at whatever the pine timber on the same shall amount to, at 125 cts. per M. in case the purchaser elects within 30 days after the purchase, to pay in that way instead of the $45,000. I will sell for $25,000, my mills at Orono, containing 2 board saws, 4 clapboard machines, 1 sapper, 2 shingle machines, 1 Lath do. with ample water power to propel the same; the house lot which was purchased with the mill, one half a log boom on Stillwater, on lease of ten years, $350 to pay, a board sluice and rafting privilege, $10 per year for 14 years, to pay for same, the whole $70,000 to be paid, $10,000 cash down, and the residue in six annual payments with interest annually and perfectly secured. The mills and timber may yield an annual income of 20,000 dollars.

"Wm. Hammatt."

Paper B. also referred to in the instructions.

"I hereby authorize and empower Hazen Mitchell and Cyrus Goss, to sell on my account, and notify me of said sale on or before the 10th of April next, township No. 1, 10th range, on the following terms, viz:— $5000 cash down, $5000 in six months, $5000 in twelve months, $5000 in eighteen months, $5000 in two years, $10,000 in three yeas and $10,000 in four years, all with annual interest from the 10th of April, 1833, and satisfactory security, if sold at the above price of 45,000

dollars and no more. I will pay a commission of 2½ per cent. on the same, but the said Mitchell and Goss, may sell at higher price and pay over to me 45,000 dollars as above, retaining whatever they may obtain over and above said sum, instead of said commission of 2½ per cent.; the title will be perfect as I have a clear deed from the Commonwealth. I will guarantee that there is 45,000,000 feet (board measure) of pine timber, on the township, and the purchaser may elect within thirty days of the purchase, to take it at a survey of all the standing pine timber at one dollar per thousand, or pay the said forty-five thousand dollars, but it must be understood, that the absolute purchase is concluded, and the cash payment made on or before the 10th of April as aforesaid. Wm. Hammatt."

" Howland 20th March, 1833."

" If the township is sold, I will sell my mills at Stillwater at $25,000. $1000 cash down, $4000 rent the present year, and the remaining $20,000, on a term of years, with interest payable semi-annually. " Wm. Hammatt."

" William Hammatt of Bangor, in the county of Penobscot, being produced, sworn and examined in behalf of the respondents in the title of these depositions named, doth depose as follows : —

" To the first interrogatory he saith, that he is sixty-one years of age and resides in Bangor ; that since 1824, during his residence in Maine, he has had the management of the public lands belonging to Massachusetts, so far as selling timber upon them was concerned, and has purchased several townships of timber land of Massachusetts.

" To the second interrogatory he saith, that he hath been such proprietor. He purchased said township in 1828, in August, he thinks. On referring to his minutes, he finds that he did so purchase in August, 1828, in company with Mr, Thacher of Boston. They purchased of the Commonwealth of Massachusetts. In Dec. 1832, he bought Mr. Thacher's part and became the sole proprietor. He had never seen the township before he purchased. All the knowledge he had of it was from the report of Wm. C. Hammatt. He had a num-

ber of other townships examined at the same time by Mr. Hammatt. He directed his son, W. C. Hammatt, to examine all the timber townships then set apart for Massachusetts, which were eight or ten in number, with a view to purchase. His report on township number one, range ten, was as favorable as upon any other township, and this is one of those which he purchased at the highest price. The examinations by W. C. Hammatt were partial or limited as he had only a month in which to do all the work. He directed Mr. Hammatt to make such examination only as would satisfy *him* that there were eight million feet of timber on a township. that was accessible by teams and water conveyance. There was not so much timber reported upon this township as upon some others but it was said that the timber was better and more convenient to be got off.

" To the third interrogatory he saith, that he owned it till June, 1833. He granted a permit on said township and had an agent there to take an account of the timber cut under that permit, and directed him to employ his leisure time in exploring and ascertaining the character and amount of timber there was upon the township, and from his verbal report he obtained information.

" In the winter of 1832 – 3, he employed John Shaw, as his agent, to take an account of timber cut on number one in the eighth range, which is across the lake from this township. Shaw was directed to take opportunities to examine number one, in the tenth range. The information received from Shaw confirmed me in my good opinion of the township.

" To the fourth interrogatory he saith, that he had cut, while he owned it, about three million feet board measure. It was cut under a permit to Bartlett and Roberts in the winter of 1828 – 9 and 1829 – 30. He believes the quality was very good.

" To the fifth interrogatory he saith, that in June, 1833, he sold the township to William Emerson for forty-five thousand dollars, two and a half per cent. off, he thinks.

" To the sixth interrogatory he saith, that he had confidence

in John Shaw, and did rely upon the information he gave at the time the deponent sold said township ; that he did then know that Hazen Mitchell was interested in said purchase. He does not know on what said Mitchell relied.

" To the seventh interrogatory he saith, that on the thirty-first of March, 1835, he purchased of the Commonwealth of Massachusetts, in company with Warren & Brown and S. H. Blake, one third each, township number three, in the fifth range ; said Shaw was employed to explore said township, about the time of the purchase, but he cannot say whether it was immediately before or immediately after the purchase. He thinks they did not rely upon Shaw's opinion in making the purchase, paying the money, or in giving obligations.

" To the eighth interrogatory he saith, that he does not know what said township was worth when he sold it, unless the price indicates its value. He does not know what it was worth in 1835.

" To the ninth interrogatory he saith, that in April, 1835, he gave Warren and Brown, at their solicitation, a certificate of which he believes the annexed paper, marked A, to be a true copy. He kept no copy at the time, but the annexed copy of certificate has been examined by him and he thinks it is a true copy.

" To the tenth interrogatory he saith, that some time, in the winter of 1832–3, he gave a bond, he thinks, running to W. C. Hammatt and J. B. Morgan to sell said township at about one dollar and a half an acre, if paid for within a certain time. Said Hammatt and Morgan did not make a demand of a deed within the terms of the bond. After the bond had expired, some other persons, to whom, as I understood, one half the interest in the bond had been assigned, insisted upon a conveyance of one half said township being made to them. He refused to convey because the bond was forfeited, and he declined selling one half. If he sold any he wished to sell the whole.

" To the eleventh interrogatory he saith, that they paid the Commonwealth a quarter of a dollar an acre, and he paid Mr.

Thacher at the rate of a dollar an acre for his interest in it. He sold it at about two dollars an acre.  On the thirty-first of March, 1835, he purchased what he considered a good township, at two dollars an acre, of the Commonwealth of Massachusetts.  He can state no further.

" The Court instructed the jury, that in order to avoid the evidence furnished by the note, the defendant must prove, that there was a fraud on the part of the plaintiff, and that this defence of fraud was open to the defendant, and that, to establish fraud, he must satisfy them : —

" 1. That representations were made by him, that he knew were not true, or that he had not good reason to believe were true.

" 2. That defendant was induced by such representations to enter into such contract.

" 3. That he has sustained damage.

" That there is a difference between the expression of an opinion and the assertion of an absolute fact.

" That the Court felt bound to give the jury distinct ruling, as a matter of law, of the meaning and effect, of the two papers A and B, introduced into the case.

" That as to the first paper A, dated March 7, 1833, it was only the expression of an opinion, and not a statement of a fact.

" That the paper B. was different, and was in itself the representation of a fact, and a statement that there was the quantity of lumber on the township therein stated, and that the jury would so regard it.

" That the paper was in the case, and from the proof (to which the Court called the attention of the jury) they would find whether it had been seen by defendant, and that they would take the Court's construction of its meaning and legal effect.   That they would look particularly at Mitchell's deposition, as to what he says respecting the renewal of those instructions.

" That on the question, whether the plaintiff knew or had good reason to believe, that the representations in B were un-

true, that the plaintiff was bound to inform himself, and not to represent, unless he had good grounds for his representations. The Court then called the attention of the jury to the evidence on this point.

" The Court further instructed the jury, that the representations must have been made for the purpose of producing the result. Was the defendant induced by these representations to give this note ? If the plaintiff made representations which he knew to be false, or had not good reasons to believe to be true, and defendant was at all influenced by them to sign the note, the defence of fraud is made out. That it was not necessary, that defendant should have been solely induced by them, or that they should have been the principal inducement, if they had influenced him at all, so that without them he would not have given the note ; it is sufficient, if it was not more than one in one hundred of the inducements. That the plaintiff was not responsible for the representations of Shaw's report made by Mitchell to Emerson, but as to the representations made by Goss and Mitchell, or either, the jury would determine whether they made such representations as the agents of the plaintiff, or were acting therein for themselves. If acting on their own behalf in those representations, and not by his authority, the plaintiff was not liable for their doings ; if as agents in such representations, he must be held responsible for all those statements and representations, and that Mitchell and Goss might be regarded as agents of the plaintiff in the sale, although they might each have been in fact purchasers of one-third, if the evidence satisfied them that such was the fact ; and in commenting upon the facts the Judge remarked, that as Emerson was surety for both Goss and Mitchell, the jury would naturally ask themselves, whether it was to be inferred therefrom that he inquired of them as to the grounds of their confidence of the value and quality of the town, and was told by them ; that the plaintiff had contended, that so far as this note was in question, that unless Mitchell could defend against it, the defendant, who had signed as surety, could not. But the Court instructed the jury,

that although Mitchell, Goss and Emerson, were in reality the purchasers of ⅓ each, and Emerson, a surety for Mitchell, for his ⅓ on this note ; yet, as between plaintiff and defendant, they must regard the defendant as purchaser of the whole township and the arrangements of Goss, Mitchell and Emerson were of no importance to the plaintiff, excepting as throwing light upon the question, from whom the representations came ; that they might regard this note as if it read, Emerson, principal, as well as Mitchell, and if the jury was satisfied that the defendant was induced to sign the note by false and fraudulent representations of the plaintiff, as before explained, made by him or Goss and Mitchell acting therein as his agents, it was a defence, although Mitchell might not have been defrauded and had no defence, and had had the one third, and realized therefrom more than he gave for it, in this purchase. If the jury found, under these instructions, fraud, they would look to see if any damage accrued to the defendant therefrom. That if the jury were satisfied, notwithstanding the fraud, the defendant had not been a loser thereby, they would return a verdict for the plaintiff; that if the defendant had lost by the fraud of the plaintiff, the whole amount of the note in suit, their verdict must be for the defendant, but if his loss had been for a part only of this note, they would deduct such part and return a verdict for the balance.

" The verdict was for the defendant. To which rulings, instructions, admissions and exclusions the plaintiff's counsel excepted."

There was also a motion filed to set aside the verdict as against the evidence, and the whole evidence was reported on that motion.

*E. F. Hodges*, for the plaintiff.

This is an action upon a note given in the purchase of a township of timber land, by the defendant and Mitchell and Goss, in thirds. This note, signed by Mitchell, as principal, and Emerson, as surety, was given for the third purchased by Mitchell. In the purchase, Emerson took the deed of the whole land and gave bonds to Mitchell and Goss, to deed

them their thirds upon payment of the notes signed by him in the purchase.

The defence offered by the defendant is fraud, to prove which the representations made by the plaintiff of the amount of timber on the township were shown.

I. The plaintiff insists, that the charge of the Court is erroneous, as it touches the relations of the parties to the contract and each other. There are three theories to be adduced from the charge upon this subject.

1. That the Court left it for the jury to say, whether the defendant purchased his third of the land, induced by the false representations of the plaintiff, and if so, it would be a defence.

This is error, for the representations do not concern or touch the consideration of the contract sued. The defendant may have received an injury in some previous and other negotiation, but it could not be offered here as a defence or a set-off.

2. The second theory is, that the Court left the jury to find whether the defendant signed as surety, induced by like representations ; and instructed them, that it would be a defence, if found in the affirmative. This is error, for the representations proved only touch the value of the property conveyed and not the credit given to the principal, and the Court should not have left it for the jury to presume from this that the defendant was induced to insure Mitchell's note by such representations.

Again, the Court took this view of the charge from the jury when they told them " they might read the note as if it read Emerson, principal, as well as Mitchell."

Again, Emerson took the property as security. The Court leave us to assume that Mitchell had sold the third, for which this note was given, and received for it more than he gave. Now Emerson, as holder of the property, is the trustee for the plaintiff, and if he allows Mitchell to dispose of it, to an amount sufficient to pay the notes, he is estopped from saying he has been defrauded and urging this defence.

Lastly. The Court tell the jury to assess damages. What

damages could the surety have suffered if Mitchell sold for more than he gave ?

3. The third theory is, the Court charge that the defendant purchased the whole land, and paid for it in Mitchell's note, which he signs as surety; he is now at liberty to defend against his signature, provided it was obtained by these representations.

The answer to this theory is this : —

The facts are not so. The defendant himself makes proof in showing the consideration of the note, that the land was purchased in thirds, and though Emerson took the deed, he gave bonds to the others, and the whole transaction was conducted by the plaintiff as a sale to the three.

II. The plaintiff again contends, that the court erred in their ruling, respecting the fraud, and insists the jury should have been left to decide, whether the plaintiff knew the representations were false or had a false intent.

In support of this, the plaintiff calls the attention of the Court to the following voluminous list of authorities. *Kidney* v. *Stoddard*, 7 Metc. 252; *Lobdell* v. *Baker*, 1 Metc. 201; *Tryon* v. *Whitmarsh*, 1 Metc. 1; *Dobell* v. *Stevens*, 3 B. & C. 623; *Baldwin* v. *Whittier*, 4 Shepl. 30; *Pothill* v. *Walker*, 5 B. & Ad. 114; *Freeman* v. *Baker*, 7 B. & Ad. 196; *Humphrey* v. *Pratt*, cited in 48 E. C. L. R. 828; *Haycraft* v. *Creasy*, 2 East, 92; *Moens* v. *Heyworth*, 10 Mee. & W. 147; *Cornfoot* v. *Fowke*, 6 Mee. & W. 358; *Taylor* v. *Ashton*, 11 Mee. & W. 401; *Ormrod* v. *Huth*, 14 Mee. & W. 651; *McDonald* v. *Trafton*, 3 Shepl. 227; *Wilson* v. *Fuller*, 3 Ad. & El. 830, N. S.; *Shrewsbury* v. *Blount*, 2 M. & G. 507; *Holbrook* v. *Burt*, 22 Pick. 554; *Stone* v. *Denny*, 4 Metc. 151; *Ames* v. *Millward*, 8 Taunt. 637; *Paisley* v. *Freeman*, 3 T. R. 60; *Corbett* v. *Brown*, 8 Bing. 33; *Linsey* v. *Selby*, 2 Ld. Ray. 1118; *Foster* v. *Charles*, 6 Bing. 396; *Adamson* v. *Jarvis*, 4 Bing. 66; *Medina* v. *Stoughton*, 1 Salk. 210; *Page* v. *Burt*, 2 Metc. 371; *Rawlins* v. *Bell*, 1 M. G. & S. 951; *McCobb* v. *Richardson*, 24 Maine R. 82; *Allen* v. *Addington*, 7 Wend. 9; *Upton* v. *Vail*, 6 Johns. R. 181; *Ashlen* v. *White*, 1 Holt. 387.

Hammatt v. Emerson.

III. The plaintiff then complains further, that the Court erred respecting paper B.

1. The Court should not presume to construe it, but should have left it to the jury. 1 Greenl. Ev. p. 400; 5 B. & Ald. 34; *Corbett* v. *Brown,* 8 Bing. 33; *Rainbow* v. *Bishop,* 7 Carr & P. 591; *Power* v. *Burham,* 7 Carr & P. 376; 10 Mee. & W. 147; 1 Stark. Ev. 427.

2. The Court did not construe the paper correctly. Inasmuch as the subject matter, history and language of the contract forbid such an interpretation. *Page* v. *Bent,* 2 Metc. 370; *Tryon* v. *Whitmarsh,* 1 Metc. p. 1; *McCobb* v. *Richardson,* 24 Maine R. 85; *Haycraft* v. *Creasy,* 2 East, 92.

IV. The plaintiff objects to the introduction of improper and exclusion of competent testimony.

1. Coffin's deposition and papers A, B, C and D, annexed, are subjects of objection.

B and D, are not public documents and should have been annexed in the original.

A, is a deed from the State to the plaintiff and by presumption of law is in the hands of the plaintiff. The plaintiff, then, should have been notified to produce the original document in order to lay the foundation of secondary evidence. *Kent* v. *Weld,* 2 Fairf. 459; *Queen's Case,* 2 Brod. & Bing. 288.

Paper C, is inadmissible as a copy and as being extracts and and not the whole document. *Queen's Case,* 2 Brod. & Bing. 284; *Rex* v. *Cleeves,* 4 C. & P. 221; *Dennis* v. *Barber,* 6 Serg. & Rawle, 420.

2. The exclusion of parts of the deposition and parts of particular interrogatories and answers. *Ives* v. *Bartholemew,* 9 Conn. R. 109; *Earl of Bathurst's case,* 5 Mod. Rep. 9; *Carver* v. *Tracy,* 3 Johns. Rep. 427; *Fenner* v. *Lewis,* 10 Johns. R. 38; *Credit* v. *Brown,* 10 Johns. R. 365; *Lawrence* v. *Ocean Ins. Co.,* 11 Johns. R. 261; 9 Johns. R. 141; 3 Salk. 154; 3 Ball. & Beat. 386; 21 Pick. 243; 2 Greenl. R. 216; Saund. Ev. 45; Gilb. Ev. 50, 51; 3 Cow. Phil. notes, 926; Phil. Ev. 359; 18 Maine R. 175; *Hewit* v. *Piggott,* 5 C. & P. 75; 2 C. & P. 569; *Smith* v. *Bland,* Ry. & M. 257;

2 Doug. 788; *King* v. *Clewes*, 4 C. & P. 221; *Randle* v. *Blackburn*, 5 Taunt. 245; *Thompson* v. *Austin*, 2 D. & R. 358; 15 East, 103; 11 Mass. R. 6—10; *King* v. *Day*, 7 C. & P. 705; *Holland* v. *Rawlings*, 7 C. & P. 38; *Watson* v. *Moore*, 1 C. & K. 626; 2 B. & P. 548; Gres. Eq. Ev. 13, 325; *Catt* v. *Howard*, 3 Stark. R. 3; *Kelsey* v. *Bush*, 2 Hill's R. 440.

3. The answer of Goss, that the representations of plaintiff induced him to purchase. This is objected to as being foreign matter.

4. Paper E, annexed to Mitchell's deposition, is objected to as being a copy of an original and as being intrinsically inadmissible.

5. The copy of a decree in the case of *Warren & als.* v. *Emerson & als.* is objected to. We say the bill and answers should have accompanied it.

*Evans* and *Rowe*, argued for the defendant. No rescinding of the contract was necessary. The jury have found that the note was obtained by means of the fraudulent representations of the plaintiff, and the damages sustained by such representations, may be given in evidence in an action for the consideration money, in whole or in part. 2 Wend. 431; 3 Wend. 236; 8 Wend. 109; 22 Pick. 510; 14 Pick. 198; 3 N. H. Rep. 458; 5 Carr. & P. 343.

The verdict ought not to be set aside on account of any rulings of the presiding Judge upon the admission of evidence.

The copies were not put in to prove a title or to establish a contract, but merely as to collateral facts, where the same strictness is not necessary.

The copy of the deed, paper A, annexed to Coffin's deposition, was put in merely to show, that the land was sold at a certain time. This might have been done by parol. 17 Mass. R. 165; 7 Pick. 10; 13 Pick. 523; 14 Pick. 133; 15 Pick. 185; 1 Greenl. Ev. 97, note. Besides, the statute provides, that a foreign deposition, as was that of the land agent of

Massachusetts, may be rejected or admitted at the discre:ion of the Court.

Papers B and D, annexed to Coffin's deposition, are copies of public papers, belonging to the land office, and cannot be taken therefrom. A copy is the best evidence to be had and is admissible. 1 Greenl. Ev. 533; Gresley on Ev. 115.

Paper C, containing all the letter relating to that subject, though not the whole letter, was not called for by us, but was put in by the deponent as part of his answer. All that was ·contained in them might have been proved by parol, by the testimony of the deponent. 4 Metc. 459; 1 C. M. & R. 277; 3 Watts & S. 395; 2 Stevens' N. P. 1517; 9 Cowen, 115; 6 Peters, 352.

The ruling in relation to Hammatt's deposition was correct. Every thing pertinent to the portion read, or tending to ex-·plain or elucidate it, was suffered to be read in evidence. 'There is no more reason for permitting distinct and independ-·ent facts to be given in evidence by the witness or deponent, made at the time of the conversation called for, than if made :at any other time. In the testimony of a witness, the whole must be stated in order to see, whether it does or does not qualify. But in a deposition, where the whole is seen, nothing, but what relates to the subject of inquiry, is admissible. ·Greenl. Ev. § 201, 218; Gresley on Ev. 13; 13 Ves. 53.

The jury found that Goss and Mitchell were the agents of the plaintiff, and their statements to Emerson in that character were admissible in evidence, whether communicated to the plaintiff or not. The letters written were properly admitted to show the whole business, and the way in which the repre-·sentations of the plaintiff or his agents induced the defendant to make the purchase. Every thing said or written, pertinent to the inquiry, was admissible. 5 Bing. N. C. 97; 2 Meeson & W. 532; 4 M. & W. 337; 3 Sumn. 1.

There is no ambiguity in the charge of the Judge, respecting the right of the defendant to set up fraud as a defence. The plaintiff contended, that it could not be done, because the defendant was a surety on the note. The instruction was,

that if the contract should be found to have been fraudulent, and the suretyship occasioned by the fraud, that the mode of signing made no difference, and the instruction is warranted by authority as well as principle. Chitty on Con. 528; 3 B. & Cr. 605; 5 Bing. N. C. 142; 2 Kent, 483. But if there had been ambiguity in the charge, the only remedy was by requesting instructions free from the ambiguity.

It can make no difference to the person injured by the fraudulent representations, whether the person making them knew them to be false or not. And he who makes the representations is equally liable for the consequences, whether he was entirely ignorant on the subject, and knew not that they were true or false, or knew them to be false. 1 Story's Eq. § 192; 2 Kent, commencement of c. 39; 3 Campb. 506; 18 Pick. 109; 1 Metc. 201; 4 Metc. 151; 4 Bing. 66; 3 Shepl. 227.

Where the representation relied on is in writing, it is for the Court to give a construction to it. The construction given to the paper designated by letter B, was right. It was merely that an offer to guaranty to a certain amount, was a representation of the existence of such fact. 3 Campb. 462; 4 Campb. 144; 2 Pick. 214; 4 C. & P. 45; 13 Wend. 277.

*Kent*, for the plaintiff, replied.

The opinion of the Court was afterwards drawn up by

SHEPLEY J. — This suit is upon a promissory note, made by Hazen Mitchell, as principal, and the defendant, as surety, and received with others by the testator in part payment for a township of land, at that time conveyed by the testator to the defendant. The other notes have been paid. The defence is a partial failure of the consideration paid for the land, not arising out of a partial failure of the title, but out of misrepresentations, respecting the quantity of standing timber trees then upon it.

1. The first question presented is, whether the defendant can be permitted to make such a defence to this note. The law, as most generally administered in this country, allows such

a defence to be made to a bill or note received in payment for personal property sold, while it remains in the hands of the seller, or in the hands of one having no superior rights.

A partial failure of the title to real estate conveyed, has not been permitted to operate as a defence *pro tanto* to a note received in payment for it. *Lloyd* v. *Jewell*, 1 Greenl. 352; *Howard* v. *Witham*, 2 Greenl. 390; *Wentworth* v. *Goodwin*, 21 Maine R. 150. In such cases the parties have been considered as entitled to that remedy, which was secured to them by their own agreements in the covenants contained in their deeds, as best suited to the fair adjustment of their rights.

When the purchaser obtains a perfect title to the whole estate, and yet finds the estate to be different, from what it was fraudulently represented to be, he can have no remedy upon any covenants usually found in conveyances. Not having contemplated such an event he could not be expected to have provided a remedy for it by any covenant or special contract. He must rely upon the remedy which the law may provide. That he finds in an action on the case, suited to enable him to recover damages for the injury thereby occasioned. Should he be allowed to prove the amount of such damage and to have it applied to reduce the amount to be recovered in a suit upon the note, the principles of law and rules of evidence applicable to an action on the case, would guide the Court and jury in making the estimate. While the note is in the hands of the payee or of one having no superior claims, the rights of the parties may be as well and as fully determined in one, as in two suits. Circuity of action may thereby be avoided, and should the vendor prove to be insolvent, the rights of the injured vendee may be better secured.

2. The second question presented is, whether the relations of the parties to the sale and purchase and their rights arising out of the form of this note, presenting the defendant as a surety for Mitchell, were correctly presented to the jury by the instructions.

It appears, that Goss and Mitchell were desirous of being

interested in the purchase, and that the testator required, that the township should be sold to a purchaser or purchasers responsible for the amount of the purchase money; and that they therefore applied to the defendant to make the purchase, under an agreement between them and him, that he should convey to each of them, one third part of the township upon payment by each of one third part of the purchase money. If this arrangement between them was communicated to the testator, he does not appear to have been a party to it, or to have had any connexion with it. The defendant became the purchaser of the whole township; and he paid or secured the whole purchase money. He derived the means to do so from Mitchell and Goss in proportion to the share, which he obliged himself by bond to convey to each of them. The relation of principal and surety between the makers of this note, received by the testator in part payment, did not alter or affect the relations or rights existing between him and the defendant as the seller and purchaser of the estate. This would have been quite apparent, if there had been no agreement, that Mitchell should become interested in the purchase. If in such case, he had paid the amount of the note to the defendant, the right of the defendant to prove, that he had been injured by the fraudulent representations of the testator, who was not therefore entitled to recover it of him, would not thereby be affected. The mere form of the note could therefore present no obstacle to the introduction of the defence. Nor could the relations between the defendant and Mitchell and Goss. The testator could not introduce an agreement or any subsequent dealings or proceedings between others, with which he had no connexion, for any other purpose than to prove, that the defendant had made such a disposition of the estate, that he had not suffered any, or if any, not so great loss, as he had alleged. If the defendant made such a disposition of the share, which he had obliged himself to convey to Mitchell, that he suffered no loss, that fact might be properly shown to disprove or to diminish the damages claimed. Mitchell being, according to the testimony, neither in fact, nor by intendment of law, a

purchaser from the testator, but only entitled upon certain conditions to become a purchaser from the defendant, his loss or freedom from loss can have no other effect upon the rights of the seller or the purchaser. If he had paid his share of the purchase money in full to the defendant, and had sustained a serious loss, that fact could not have been introduced by the defendant to enhance the damages claimed by him. It would still continue to be true, that he had suffered no loss on account of that share. The plaintiff does not appear to have been aggrieved by the instructions on these points.

3. The next question presented by the exceptions is, whether the jury were correctly instructed, that the fraud might be considered as proved, if they were satisfied, " that representations were made by him that he knew were not true, or that he had not good reason to believe were true."

The common law requires good faith in every business transaction, and does not allow one to intentionally deceive another by false representations or by concealments. But it does not make the vendor responsible in damages for every unauthorized, erroneous, or false representation made to the vendee, although it may have been injurious. The representation must have been false, have been fraudulently made, and have occasioned damage. *Fraus* includes the idea of intentional deception. When one has made a false representation, knowing it to be false, the law infers, that he did so with an intention to deceive. And when one has made a representation positively, or professing to speak as of his own knowledge, without having any knowledge on the subject, the intentional falsehood is disclosed, and the intention to deceive is also inferred. The action to recover damages for such a representation is in law denominated an action of deceit, and the declaration should allege, that the representation was made with an intention to deceive, or that it was falsely and fraudulently made, which is equivalent to it. That a false representation or concealment, made or withheld with an intention to deceive, is an essential ingredient in the maintenance of such an action, is most clearly established by the decided cases. In

the leading one of *Pasley* v. *Freeman,* 3 T. R. 51, Mr.
Justice Buller says, "that knowledge of the falsehood of the
thing asserted constitutes fraud." And Mr. Justice Ashhurst
says, "the *quo animo* is a great part of the gist of the action."
The whole current of decisions in England, since that time,
runs in the same channel with an apparent diversion occasion-
ally, when some unlawful act, express or implied warranty,
guaranty, or agency, becomes an ingredient in the case and
affects the principle upon which the decision has been made.
In such divergent cases the influence of another element upon
the decision is not always very fully or clearly stated. It is
true, that Lord Kenyon stated, in the case of *Haycraft* v.
*Creasy,* 2 East, 104, that "the intent was immaterial, if the
act done were injurious to another," but he delivered a dissenting
opinion and the decision made by other members of the court
repudiates such a doctrine. Mr. Justice Lawrence stated, in
order to support the action, the representation must be made
*malo animo.*" Mr. Justice Le Blanc said, "by fraud I under-
stand an intention to deceive." In the case of *Polhill* v. *Wal-
ter,* 3 B. & Ad. 114, Lord Tenterden appears to have in some
degree yielded assent to a position taken in argument, that it
was "enough if a representation is made, which the party
making it knows to be untrue, and which is intended by him,
or which, from the mode in which it is made, is calculated to
induce another to act on the faith of it in such a way, as that
he may incur damage, and that damage is actually incurred."
The case however does not appear to have been decided upon
the latter clause of that position, but upon the principle, upon
which the cases of *Foster* v. *Charles,* 6 Bing. 396, and S. C.
7 Bing. 105, and of *Corbett* v. *Brown,* 8 Bing. 33, were
decided. His lordship considered a wilful falsehood to be
essential to the maintenance of the action, but it does not
appear to have occurred to him at that time, that when one
makes a representation, which he knows to be untrue, that the
law infers, that he did it with an intention to deceive. In the
case of *Foster* v. *Charles,* as reported in 6 Bing. 396, Tindal
C. J. said, "the law will infer an improper motive, if what the

defendant says is false within his own knowledge, and is the occasion of damage to the plaintiff." This explains his meaning, where he said in the same case, that he was not aware, that it was necessary to show the motive, which actuated the defendant, or that it could be material, what the motive was; that is, whether the motive for making a representation, known to be false, was to benefit himself or a third person, or what it was, could not be material; the improper motive or intention to deceive, the law would infer from proof, that a representation known to be false had been made. There is danger, that one may be misled by noticing the verdict of the jury in the same case, as reported in the 7 Bing. 105, and that the plaintiff had judgment upon it. The jury returned a verdict for the plaintiff, but added, "we consider there was no actual fraud on the part of the defendant, and that he had no fraudulent intention, although what he has done constituted a fraud in the legal acceptance of the term." The verdict was found under instructions, which were considered as explaining the *addenda*. These were, "that if the defendant made representations concerning Jacque, the tendency of which was to occasion loss to the plaintiff, knowing such representations to be false, and intending thereby to benefit himself, he was guilty of fraud in the common acceptation of the term; if he made such representations knowing them to be false, without proposing thereby any advantage to himself, but proposing, perhaps, to benefit a third person, he was guilty of fraud in the legal acceptation of the term." The jury appear to have had their attention called unnecessarily to the consideration, whether the representation was made from a motive of benefit to himself or to a third person. This was immaterial. Judgment was rendered upon the verdict upon the conclusion by the Court, that "the jury in finding that he had no intention to defraud, mean only, that he was not actuated by the baser motive of obtaining an advantage for himself," and that he was guilty of fraud by stating what he knew to be false. In the case of *Corbett* v. *Brown*, 8 Bing. 33, a new trial was granted on the principle, that

fraud or intentional deceit must be inferred from a representation known to be false, by him who made it.

The case of *Fuller* v. *Wilson*, 3 Ad. & El. N. S. was an action on the case alleging, that the defendant made false representations with an intention to deceive, injure and defraud. As it was presented on the first trial, it did not appear, that the defendant made personally any representations. It did appear, that her attorney, without any instructions from her, made false representations without knowing them to be false. Lord Denman, in his opinion, appears to have adopted a proposition contained in a dissenting opinion of Lord Abinger, C. B. delivered in the case of *Cornfoot* v. *Fowke*, 6 M. & W. 358, " that whether there was moral fraud or not, if the purchaser was actually deceived in his bargain, the law will relieve him from it." If such were the law, upon which actions on the case for deceit were to be decided, the only question would be, whether the purchaser was actually deceived by the false representations, without any regard to the consideration, whether the seller fully believed them to be true and made them without any intention to deceive. Such a doctrine cannot be admitted without making a great change in the well settled principles of law. That case was again tried, a special verdict was found, judgment was entered for the plaintiff in the Queen's Bench, and a final decision was made in the Exchequer Chamber, upon a writ of error. The facts, as stated in the special verdict, were in some respects different from those proved on the first trial. The judgment of the Queen's Bench was reversed. 3 Ad. & El. N. S. 68. In the case of *Evans* v. *Collins*, 5 Ad. & El. N. S. 804, Lord Denman, in delivering the opinion of the court, again exhibited doctrines similar to those, which he had advanced in the case of *Fuller* v. *Wilson*. The plaintiffs being sheriffs of London, handed a writ against one John Wright to their officer, Slowman, for service. Slowman, hearing of a person of that name, described him in a letter to the defendants, received by their clerk, who told Slowman, that the person described was the John Wright named in the writ. Slowman detained and imprisoned

him. As he proved to be a different man, Slowman, or plain-
tiffs as his principals, were obliged to pay him damages. Lord
Denman said, " the sufferer is wholly free from blame, but
the party, who caused his loss, though charged neither with
fraud nor with negligence, must have been guilty of some
fault, when he made a false representation." — " The allega-
tion, that the defendant knew his representation to be false, is
therefore immaterial." Upon this ground, the plaintiffs recov-
ered in an action on the case for deceit. The essence of this
doctrine is, that an injury occasioned by a false representation
accompanied by " some fault," is sufficient to support such an
action. The law of England on this subject does not appear
to be so vague and unsatisfactory. The plaintiffs might have
been entitled to recover in a proper action, upon the principle,
that if one directs his servant to do an act supposed to be law-
ful, and the servant suffers damages in consequence of his
obedience, he may call upon his master for indemnity upon an
implied engagement to save him harmless.

The whole doctrine was elaborately examined in Massachu-
setts, in the case of *Stone* v. *Denny*, 4 Metc. 151. Mr. Jus-
tice Dewey, in his opinion says, " that now as formerly to
charge a party in damages for a false representation not
amounting to a warranty, it must appear that it was made with a
fraudulent intent, or was a wilful falsehood." — " Such fraud
will be inferred, when the party makes a representation, which
he knows to be false, or as to which he has no information and
no grounds for expressing his belief." — " So also if he posi-
tively affirms a fact as of his own knowledge and his affirma-
tion is false, his representation is deemed fraudulent." The
conclusion was, that the action " could only be maintained,
when the false representation had been intentional on the part
of the vendor, or what would be equally fraudulent in law,
knowing that he was affirming as to the existence of a fact,
about which he was in entire ignorance."

The law on this subject was examined in an opinion deliver-
ed by Savage C. J. in the case of *Allen* v. *Addington*, 7
Wend. 1, wherein he states, " it must therefore be considered

settled, both in England and in this State, that an action lies for a false recommendation of a third person, by which the plaintiff sustains damage, provided such recommendation be made with an intention to deceive and defraud the plaintiff." He states, that it is not necessary, that he should have intended to defraud the plaintiff in particular, if there be proof of a general intention to defraud.

In this State, the law in relation to this action was stated in the case of *McDonald* v. *Trafton,* 15 Maine R. 225, to be that "fraud in such cases consists in an intention to deceive. Where the evidence does not prove, that the party making the representation knew it to be untrue, the fraud can be established only by proof of a design to deceive by making statements, of which the party knows nothing." In the case of *Ingersoll* v. *Barker,* 21 Maine R. 474, the jury were to find, whether the defendant induced the plaintiff's agent to relinquish a lien by fraudulent representations. They were instructed, that they must be satisfied, that the property was obtained "by representations, which were false, known by him to be false, made with a design to deceive and obtain the property, and that the agent of the plaintiffs was thereby deceived." The instructions also stated, that if the defendant "made false representations and known to him to be false, the intention would be left to the jury, and intention to deceive would, as a matter of fact, be implied, unless there were facts and circumstances in the case to rebut such implication." In the opinion delivered by Whitman C. J. it was said, " we are unable to see wherein the rulings of the Judge, who presided at the trial of this cause, or his instructions to the jury were justly exceptionable. Fraud is almost always a matter of inference from circumstances. Direct proof of it can seldom be expected. Concealment and disguise are often essential ingredients in it. It consists in intention." Kent, speaking of the principle established by the case of *Pasley* v. *Freeman,* and by other English and American cases, says, "misrepresentation without design is not sufficient for an action." 2 Kent's Com. 490.

It is insisted by the counsel for the defendant, that a less

rigid rule is exhibited in the authorities cited by him. Story, in his commentaries on equity jurisprudence, § 193, says, " and even if the party innocently misrepresents a fact by mistake, it is equally conclusive ; for it operates as a surprise and imposition on the other party." His purpose was to speak of the principles of law, upon which relief might be obtained in equity, and he did not design to apply such a doctrine to a false representation made by a vendor. Nor would the cases cited by him in support of the proposition, authorize it. An innocent misrepresentation of a fact, inducing another to act upon it, may conclusively bind the party making it, in certain cases. This rule was admitted and applied in the case in equity of *Harding* v. *Randall,* 15 Maine R. 332. But the doctrine has never been applied to representations made by a vendor to a vendee.

By applying the doctrine, as herein asserted, to the instructions in this case, it will be perceived, that if one may make representations, " that he had not good reason to believe were true," without any intention to deceive ; the instructions cannot be considered as sufficiently guarded to prevent an erroneous conclusion. The jury would be authorized to determine whether the vendor had or had not good reason to believe that his representations were true. They may therefore have found, that he had not good reason to do so, because he was too credulous or careless to avoid being deceived by information obtained from others, by which no intelligent person in the exercise of common prudence, ought to have been deceived. Such a finding would be based upon the imprudence or carelessness of the vendor, and not upon any fraudulent purpose or intention to deceive. Although it may be highly improbable, that the verdict rests upon any such basis, yet, as the Court cannot by the means afforded, determine that it does not, injustice might be done, if judgment were rendered upon it.

4. A fourth question presented is, whether the instructions respecting the paper bearing date on March 20, 1833, subscribed by the testator and identified as paper B, were correct.

They were instructed, that it "was in itself the representation of a fact and a statement, that there was the quantity of lumber on the township therein stated." That paper authorized Mitchell and Goss to make sale of the township of land upon certain prescribed terms, and it contained the following clause. " I will guarantee, that there is 45,000,000 feet, (board measure) of pine timber on the township ; and the purchaser may elect within thirty days of the purchase, to take it at a survey of all the standing pine timber at one dollar per thousand, or pay the said forty-five thousand dollars." This clause appears to have been designed to offer to the purchaser an election, to be made within thirty days after he had actually made the purchase for the sum of forty-five thousand dollars, to purchase at that price, or upon payment of one dollar per thousand feet for all the standing pine timber, to be ascertained by a survey. And to bind the seller after such an election to deduct the difference, in case a less quantity than forty-five millions should be found upon it, from the forty-five thousand dollars already secured to be paid. The owner of a township of land without having any personal knowledge or information, upon which he could safely rely, respecting the standing timber upon it, might be willing to make such a contract for the sale of it. The purchaser could not neglect for more than thirty days to make an election and have such survey made, and yet do it at any subsequent time, and then call upon the seller to make good the difference between the amount found upon it, and forty-five millions, and yet the same effect may be produced by regarding the guaranty as a positive representation, that there were in fact forty-five millions upon it. For if it were regarded as such a representation, its wilful falsity might be established by such a survey, and the purchaser, by an action founded upon such false representation, might obtain all the advantages, which he could have obtained by a compliance with the terms of the guaranty. And the result might be, that both parties would find themselves some years after the purchase and sale in the same position, as they would have been, had the election been made under the guaranty within the

thirty days.  But such could not have been the intention of the parties.  The seller could not have intended by that guaranty to assert, that there certainly were forty-five millions feet of standing timber upon the township, for the paper contemplates it as fact yet uncertain and yet to be ascertained by a survey, and that it might fall short of that quantity, and that the seller might be obliged on account of it to make a deduction from the price secured to be paid.

It can readily be perceived, that a person of the most delicate moral sense, might be willing to guaranty or warrant, an article to be of a certain quality, or an estate to contain a certain quantity of limestone, or of coal, or of pine timber upon it, and yet be wholly unwilling to assert the same to be a matter of fact.  An agreement then, containing a guaranty does not necessarily include the idea or authorize the inference, that the person making it, knows the fact to be, as the guaranty stipulates, that it shall be for the foundation, upon which business is to be transacted.  The document referred to in this case, is of that character, and the extent of the inference fairly deducible from it, is, that the person making it, so fully believed, that the fact would prove to be so, that he was willing to take a less sum for the land, if it should prove to be otherwise.

5. Several objections taken to the admission of testimony are still insisted upon, and it may be desirable to have them determined, that they may not arise again on a new trial.

The deed of a grantee of the State, cannot be considered as belonging to the archives of the State, and it cannot be proved, by a copy made by its land agent.  The copy thus made and introduced, as annexed to the deposition of George W. Coffin, of the deed from the Commonwealth of Massachusetts to the testator, does not come within any rule authorizing its admission.

The contract made by the agents of the Commonwealth, to convey the township to Charles Thatcher, with an assignment of it made by Thatcher to Hammatt, appears to have been surrendered to the Commonwealth by Hammatt, and to have

become a paper belonging to its archives; and proof in such case might be a duly authenticated copy.

The letters addressed to a public officer in his official capacity, when received, become public documents to be proved in like manner. But extracts of portions of them cannot be received.

The letters from Hazen Mitchell to Josiah S. Little and to Cyrus Goss, and the letter from Goss to Mitchell could be legal evidence only upon the ground, that their contents were communicated to, and approved by Hammatt, or that they were written by his agents, acting within the scope of their authority, and their contents made known to the defendant as an inducement to purchase. There appears to have been some testimony tending to prove this, and authorizing their introduction; but the original letters only, could be thus introduced, without proof that they had been lost.

The copy of the decree of the Circuit Court of the United States, although not made in a case between these parties, was the only legal testimony to prove the fact, that the sale made by the defendant to Warren and Brown, had been annulled, and the consideration decreed to be restored.

The testimony of Cyrus Goss, detailing the representations made to the defendant by him, acting as the agent of Hammatt, appears to have been properly admitted. That portion of his testimony containing a statement of what induced the witness to purchase, should not have been admitted.

That part of the testimony of Amos M. Roberts, which states, what would have been considered a good township, should have been excluded. He could not properly be admitted to testify to matters of opinion, with certain exceptions not authorizing such testimony.

Another question is presented, not free from difficulty, respecting the admission of a portion and the exclusion of the residue, of a deposition of the plaintiff, taken and used in another court in a case between other parties.

The doubt is, whether the rule respecting admissions made in conversations or declarations, and proved by parol testimony,

Hammatt v. Emerson.

be applicable; or the rule respecting admissions made in, and proved by bills and answers in chancery, letters, and other written documents.

When proof of the former kind, is introduced by parol testimony, it is by the more recent decisions limited to what was said or done at the same time, relative to the same subject. *Prince* v. *Samo*, 7 Ad. & El. 627; *Sturge* v. *Buchanan*, 10 *idem*, 598; *Garey* v. *Nicholson*, 24 Wend. 351; *Clark* v. *Smith*, 10 Conn. R. 1. If this rule be applicable, it appears to have been correctly applied.

When proof of the latter kind, is made by a document, the whole matter contained in it, becomes testimony in the case, for part cannot be received and a part excluded. 1 Stark. Ev. (ed. by Metc.) 282 to 289; *Lynch* v. *Clerke*, 3 Salk. 154; *Roe* v. *Ferrars*, 2 B. & P. 548, and note (a); *Lawrence* v. *Ocean Ins. Co.* 11 Johns. 260. It has been decided, that this rule does not apply to the day book of a party, containing entries of divers matters at different times. *Catt* v. *Howard*, 3 Stark. Rep. 3. Or to the records of proprietors of lands made at different adjournments of the same meeting. *Pike* v. *Dyke*, 2 Greenl. 213.

Its applicability to a deposition, presented as in this case, does not appear to have been decided in any case noticed. By the answer of eminent counsel, made to a question put by Mr. Justice Coleridge, in the case of *Prince* v. *Samo*, it appears, that the question now presented, was not known by them to have been at that time decided.

The deposition of the plaintiff, after it had been used in the cause for which it was taken, became a judicial document on the files of that court, from which it could not be removed without leave. When thus obtained, and offered in this Court, it could not be legally admitted in the character of a deposition. Nor could it be treated as such. No marks or erasures could properly be made upon it to indicate the portions admitted and excluded, for it must, as a judicial document of another tribunal, be preserved in the condition, in which it was presented. It could be received only after proof or admission of

the signature of the plaintiff and as a paper signed by him. If leave could not be obtained for its removal from the files of another court, the signature being proved, a duly authenticated copy might have been received. But to receive a part and to exclude a part of a copy of a document coming from the files or records of another court, would, it is believed, be an unauthorized course of proceeding.

Inquisitions, examinations, depositions, affidavits, and other written papers, when they have become proofs of its proceedings and are found remaining on the files of a judicial court, are judicial documents. 1 Stark. Ev. 212, 260.

In the case of *Benedict's adm'rs* v. *Nichols*, 1 Root's Rep. 434, it was decided, that the statements of one, made and reduced to the form of a written examination in the court of probate, could not be proved by parol testimony ; and that the whole examination being produced, must be read and taken together. But in that case, the present question does not appear to have been decided, for the parts proposed to be received and excluded, contained statements respecting the same subject ; and not, as in this case, respecting different subjects.

In the case of *Faunce* v. *Gray*, 21 Pick. 243, the deposition of the defendant, taken *in perpetuam,* was received in evidence, not as a deposition but as a written statement and confession made by him. It does not appear that any question was made, whether a part of it could be read and the residue excluded.

As the deposition of the plaintiff in this case, could not be received, or dealt with as such, or in that character, as it had become a judicial document, and could only be proved and received as such ; the impression is, that the rule respecting the admission of judicial documents, became applicable to it ; and that the whole document would become testimony in the case.

*Exceptions sustained,*

*and new trial granted.*